COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., Defendant.

No. 77 Civ. 1174–CSH.

United States District Court, S. D. New York.

March 23, 1977.

Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, for plaintiff; Charles V. Koons, Washington, D. C., Philip D. Tobin, Roy N. Watanabe, New York City, of counsel.

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, for defendant; David L. Benetar, Stanley Schair, Robert A. Levitt, Robert W. Benson, Greensboro, N. C., Mark H. Leeds, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

Plaintiff Communications Workers of America, AFL–CIO (the "Union"), invoking Section 301(a) of the Labor Management Relations Act,[1] seeks a preliminary injunction, in aid of arbitration, against defendant Western Electric Company, Inc. (the "Company") to enjoin transfers of employees which the Union contends violate principles of seniority, in breach of the contract between the parties. The Company contends that this Court lacks jurisdiction to give injunctive relief, or alternatively that the Union is not entitled to such relief in the circumstances. The case presents questions of the interaction of the Labor Management Relations Act and the Norris-LaGuardia Act,[2] viewed from the heights of the Supreme Court's decisions in *Boys Markets, Inc. v. Retail Clerks Union*[3] and *Buffalo Forge Co. v. United Steelworkers of America.*[4] The Court has held the evidentiary hearings required by the applicable statute[5]

1. 29 U.S.C. § 185(a).

2. 29 U.S.C. §§ 101 *et seq.*

3. 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

4. 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

5. 29 U.S.C. § 107.

and rule.[6]

The Court concludes:

(a) Contrary to the Company's contention, this Court has jurisdiction to give injunctive relief.

(b) Contrary to the Union's contention, it is not entitled to injunctive relief at this time.

(c) The parties shall be directed to proceed to expedited arbitration, this Court retaining jurisdiction for the purposes stated *infra*.

## I.

This case illustrates the pressures that a business recession and technological development place upon companies and skilled employees. Western Electric, the Company in the case at bar, is the manufacturing and supply division of the Bell system, manufacturing, installing and repairing telephone and central office equipment for the members of that formidable corporate communications family.[7] The Union is the bargaining agent for the Company's installers. The parties entered into a nationwide, three-year contract on August 11, 1974.

In 1971 the Company employed more than 30,000 installers. The present employment roll is down to 16,500. Further reductions in the work force are projected, gradually declining to a level of about 15,000 in 1981. The causative factors include a falling off of new building construction (thus reducing the need for new telephone installation) and miniaturization of equipment (thus reducing the need for installers).[8] The consequences upon Union members, as they have been laid off, are severe.

The contract contains detailed provisions for layoff and recall. They are found in Article 20, euphemistically captioned "Adjustments to the Working Force". Art. 20,

¶ 1 introduces the subject with a general statement of understanding:

"The Company desires to maintain employment as near to a constant level as possible. Both parties recognize, however, that the needs of the business and its efficient operation may necessitate reassignment of personnel or the addition to, or decrease in the working force."

Article 20 then provides, in effect, for layoffs of employees, in inverse order of term of employment, within certain categories based upon seniority.[9] The more seniority an employee has, the more protected he is from layoff. Employees who have attained 10 years seniority are the last to be laid off, and such an employee "cannot be laid off until the employees in all other base locations with less than 10 years' service are laid off."[10] This nationwide requirement contrasts with the layoff provisions in respect of employees with less seniority, where layoffs are accomplished within "layoff groups" of more narrow geographic boundaries.[11]

Article 20 also provides for the recall of employees from layoff:

"A former Employee who has been Laid-Off shall be returned to work in the inverse order of Layoff (except as provided in Paragraph 7.1) at the Base Location from which he or she was Laid-Off provided he or she makes himself or herself locally available to said Base Location and provided he or she is qualified for the work to be done, physically fit *and has not been Laid-Off for more than two (2) years.*" (emphasis added).[12]

The effect of the italicized phrase is to remove a laid-off employee from the recall list at the end of two years. He thereby loses his contractual right to insist that he be preferred to a new employee, in the event that the Company resumes hiring.

---

**6.** Rule 65(b), F.R.Civ.P.

**7.** Clancy, 143 (references are to the transcript).

**8.** Clancy, 156, 160–1.

**9.** Art. 20, ¶¶ 3–3.5.

**10.** Art. 20, ¶ 3.6; Clancy, 157.

**11.** Art. 20, ¶¶ 3.1, 3.2.

**12.** Art. 20, ¶ 7.

The contract also contains elaborate provisions for transfer of employees from one location to another, either on a permanent or temporary basis.[13] The Company regards these provisions as crucial, because of its need to maintain a highly mobile work force, responding to installation and repair requirements as they arise around the country.[14] That practical necessity is recognized by the contract:

> "The Company and the Union agree that the character of installation work makes it necessary for an Employee to move to and from Job Locations and Work Locations. The Company will effect such a move by a Local Assignment, a Temporary Transfer or a Permanent Transfer."[15]

Transfers take place between various "base locations", or between "areas" (which comprise more than one base location), or between "regions" (which comprise more than one area).

The contract also provides for resolution of disputes, first by reference to a grievance procedure which works its way up through various levels of the Company and Union;[16] if, after grievance procedures have been exhausted, the dispute has not been settled, the contract provides for arbitration.[17]

We now come to the events which give rise to the present litigation. During the first week of this year, the Company implemented a number of transfers of employees, from one area into another, the effect of which was to transfer into a particular area employees of less seniority than employees who were on layoff within the area into which the transferees were assigned. The Union takes the position that such transfers, of "junior" employees into areas where "senior" employees are laid off, constitutes a violation of the recall provisions of Art. 20, ¶ 7. The Company, resisting that construction of the contract, takes the position that its transfer options under Art. 13, in respect of temporary transfers, are entirely unfettered by any concepts of seniority.[18]

The parties recognize, as is clearly the case, that this question of contractual construction must be resolved by the arbitrator. Furthermore, counsel for both parties and their representatives agreed at the hearing to cooperate in an expedited arbitration. Specifically, the Company has

13. Art. 13, captioned "Local Assignments and Transfers".

14. Clancy, 144.

15. Art. 13, ¶ 2.1.

16. Art. 7.

17. Art. 8 provides as follows:
"1. If the International and the Company fail to settle by negotiation any differences arising with respect to the interpretation of this contract or the performance of an obligation hereunder, such differences shall (provided that such dispute is not excluded from arbitration by other provisions of this contract, and provided that the grievance procedures as to such dispute have been exhausted) be referred upon written demand of either party to an impartial arbitrator mutually agreeable to both parties. Such demand shall be presented within ninety (90) days after the Company notifies the Union of its final answer to the grievance. Each such referral shall include but one such dispute unless otherwise agreed. If, within ten (10) days of such demand, the parties are unable to agree on the person to be selected as arbitrator, an arbitrator shall be designated upon request of either party by the Federal Mediation and Conciliation Service or the American Arbitration Association. The direct expense of the arbitration, but not including the expense incurred by the parties or their witnesses, shall be borne equally by the Union and the Company.
"2. The arbitrator shall have no authority to alter or modify the provisions of this contract. Any decision made in compliance with the foregoing shall be final and the parties agree to abide by such decision."

18. Permanent transfers are selected by inverse order of term of employment. Art. 13, ¶ 2.91(a). "Temporary transfers" are not defined by the contract in terms of time. The Company has agreed to try:
". . . to rotate Installers who have been on Temporary Transfers long distances from their assigned Base Locations for extended periods of time to the extent that job and work-load requirements and other business conditions permit." Letter of Intent dated December 1, 1966, p. 259 of contract.
An "extended period of time" is apparently construed to be 13 weeks.

stated in writing its willingness to waive the grievance procedures preliminary to arbitration;[19] the Court understands the Union to express a similar willingness.

The Union filed its complaint in this Court seeking a preliminary injunction which it characterizes as "in aid of the arbitration". Specifically, the Union asks this Court to enter a preliminary injunction, enjoining and restraining the Company:

". . . from (a) transferring or causing to be transferred any employees from one Area of the Company to another Area of the Company within the United States where the effect of the transfer is to bring into that Area employees whose seniority is less than the highest seniority of employees currently on layoff status in that Area, and (b) maintaining in its Area work forces within the United States employees who have already been transferred to those Areas whose seniority is less than the highest seniority of employees currently on layoff status in those Area work forces, . . ."

In other words, if the injunction is granted, the Company must stop transferring "junior" employees into areas where employees of greater seniority are presently laid off; and, in respect of such transfers that have already been accomplished, the "junior" transferred employees must be sent back to where they came from.

The Company vigorously insists that the Union is not entitled to injunctive relief, either on the law or on the facts.

## II.

The Company's threshold contention is that this Court lacks jurisdiction to give any injunctive relief. Primary reliance is placed on the Supreme Court's recent decision in *Buffalo Forge Co. v. United Steelworkers of America, supra.*

To evaluate the contention, a brief historical review is necessary.

In 1932 Congress passed the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. The statute reflected the desire of Congress to protect the rights of laboring men to organize and bargain collectively, and to correct perceived existing abuses of injunctive remedies in labor disputes. *Marine Cooks & Stewards, AFL v. Panama S.S. Co.,* 362 U.S. 365, 370, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960), *rehearing den.,* 363 U.S. 809, 80 S.Ct. 1235, 4 L.Ed.2d 1151; *Brotherhood of R.R. Trainmen v. Chicago R. & I. R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), *rehearing den.,* 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857. Thus § 1 of the Act, 29 U.S.C. § 101, provides that "no court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute except in strict conformity" with the Act's provisions. The two principal provisions implementing this policy are § 4, 29 U.S.C. § 104, and § 7, 29 U.S.C. § 107. Their respective functions are summarized in *United States Steel Corp. v. United Mine Workers of America,* 456 F.2d 483, 487 (3rd Cir. 1972), *cert. den.,* 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334:

"The thrust of § 4 of the Norris-LaGuardia Act is quite different from that of § 7. The former is a list of injunctive orders which the federal district courts are flatly prohibited from entering. The latter is essentially a procedural section. It prohibits the entry of an injunction growing out of a labor dispute

'except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered . . .

Such hearing shall be held after due and personal notice . . .' 29 U.S.C. § 107."

In 1947 Congress enacted the Labor Management Relations Act, 29 U.S.C. §§ 141 *et seq.* § 301(a), 29 U.S.C. § 185(a), provides:

---

19. "The Company, as already indicated to the Union, is prepared to waive all levels of the grievance procedure not yet exhausted and to speed up all aspects of the arbitration process." Company's main brief, pp. 7–8, n. 5.

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Federal courts were quick to conclude that the unqualified word "suits" in § 301(a) "authorizes injunctive process for the full enforcement of the substantive rights" created by the section. *Milk & Ice Cream Drivers & Dairy Employees Union v. Gillespie Milk Product Corp.*, 203 F.2d 650, 651 (6th Cir. 1953).

However, the tension between Norris-LaGuardia's prior anti-injunction provisions and this view of § 301(a) became apparent. The Supreme Court addressed that tension in *Boys Markets*, speaking as it did so in the soothing tones of accommodation and reconciliation. 398 U.S. at p. 251, 90 S.Ct. 1583.

*Boys Markets* involved a labor contract containing a broad arbitration clause and a non-strike or picketing clause. An arbitrable dispute arose, and the union put up a picket line. The employer, pleading irreparable injury and proving it to the district court's satisfaction, obtained an order pursuant to § 301(a) directing arbitration and enjoining the picketing. The Ninth Circuit reversed, considering itself bound by *Sinclair Refining Co. v. Atkinson*,[20] which held that § 4 of the Norris-LaGuardia Act bars a federal district court from enjoining a strike in breach of a no-strike clause in a collective-bargaining agreement, even though that agreement contains binding arbitration provisions enforceable under § 301(a) of the Labor Management Relations Act. In *Boys Markets* the Court took the opportunity of overruling *Sinclair Refining Co.*, concluding that:

"The literal terms of § 4 of the Norris-LaGuardia Act must be accommodated to the subsequently enacted provisions of § 301(a) of the Labor Management Relations Act and the purposes of arbitration." 398 U.S. at p. 250, 90 S.Ct. at p. 1592.

Accommodation was necessary, the Court observed, because of the shifting demands of public policy evidenced by these statutes:

"The Norris-LaGuardia Act was responsive to a situation totally different from that which exists today. In the early part of this century, the federal courts generally were regarded as allies of management in its attempt to prevent the organization and strengthening of labor unions; and in this industrial struggle the injunction became a potent weapon that was wielded against the activities of labor groups. The result was a large number of sweeping decrees, often issued *ex parte,* drawn on an *ad hoc* basis without regard to any systematic elaboration of national labor policy. See *Drivers' Union v. Lake Valley Co.*, 311 U.S. 91, 102 [61 S.Ct. 122, 127, 85 L.Ed. 63] (1940). "In 1932 Congress attempted to bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of management. See declaration of public policy, Norris-LaGuardia Act, § 2, 47 Stat. 70. Congress, therefore, determined initially to limit severely the power of the federal courts to issue injunctions 'in any case involving or growing out of any labor dispute . . .' § 4, 47 Stat. 70. Even as initially enacted, however, the prohibition against federal injunctions was by no means absolute. See Norris-LaGuardia Act, §§ 7, 8, 9, 47 Stat. 71, 72. Shortly thereafter Congress passed the Wagner Act, designed to curb various management activities that tended to discourage employee participation in collective action.

"As labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to the

---

**20.** 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962).

encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes. This shift in emphasis was accomplished, however, without extensive revision of many of the older enactments, including the anti-injunction section of the Norris-LaGuardia Act. Thus, it became the task of the courts to accommodate, to reconcile the older statutes with the more recent ones." 398 U.S. at pp. 250–1, 90 S.Ct. at p. 1592.

The Supreme Court in *Boys Markets,* reversing the Ninth Circuit and reinstating the order of the district court, performed such an act of accommodation.

The Court in *Boys Markets* made it clear that the Norris-LaGuardia Act had not been deprived of all vitality:

"Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a *collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure.*" 398 U.S. at p. 253, 90 S.Ct. at p. 1594 (emphasis added).

Furthermore, the Court made it clear that, even in such a case, injunctive relief was not appropriate as a matter of course. The Court, in *Boys Markets,* adopted the principles set forth in the dissent in *Sinclair Refining Co., supra:*

" 'A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condi-

tion of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' " 370 U.S., at 228, 82 S.Ct. at 1346. (Emphasis in original.)

Because such showings had been made by the employer in *Boys Markets,* the Court reinstated the district court's injunction.

The lower federal courts, thus freed by the Supreme Court of certain inhibitions arising out of the Norris-LaGuardia Act, responded by issuing, in an appropriate case, the sort of order which one court of appeals has characterized as a "Boys Markets" injunction. *Avco Corp. v. Local Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 459 F.2d 968, 969 (3rd Cir. 1972). Sometimes, as in the case just cited, it is the union which is enjoined. However, a number of other cases have enjoined action by the employer.[21]

In *Hoh v. Pepsico, Inc.,* 491 F.2d 556 (2d Cir. 1974), the Second Circuit made it entirely clear that it interpreted *Boys Markets* as permitting an injunction against an employer, notwithstanding the provisions of § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107. In that case, Judge Friendly's opinion specifically rejected the employer's contention that:

". . . despite *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, as distinguished from § 4, 29 U.S.C. § 104, remains applicable when an

---

**21.** *Local Div. 1098, Amalgamated Assoc. of Street, etc. Employees v. Eastern Greyhound Lines,* 225 F.Supp. 28 (D.D.C.1963) (a decision by Judge Holtzoff which antedates and foreshadows *Boys Markets*); *International Union of Electrical, etc. Workers v. RCA,* 77 LRRM 2201 (D.N.J.1971); *Technical, Office & Professional Workers Union v. The Budd Co.,* 345 F.Supp. 42 (E.D.Pa.1972).

injunction is sought in a labor dispute, even in aid of arbitration." 491 F.2d at p. 560.

Rejecting that assertion as perhaps going "somewhat too far", the Second Circuit said in *Hoh:*

"We prefer Judge Gibbons' formulation in *United States Steel Corp. v. United Mine Workers,* 456 F.2d 483, 487 (3 Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972), that § 7 remains applicable so far as consistent with the policies of § 301 of the Labor Management Relations Act as interpreted in the dissenting opinion in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215, 228–229, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), which the Court approved in *Boys Markets, supra,* 398 U.S. at 249–253, 90 S.Ct. 1583." 491 F.2d at p. 560.[22]

Thus it was clear in this Circuit, at least subsequent to *Hoh v. Pepsico, Inc.,* that a union suing under § 301(a) could obtain an injunction against an employer, if the union could demonstrate that such relief was necessary under the recognized principles of equity. To those equitable principles, set forth in the dissent in *Sinclair Refining Co.,* and adopted by the Court in *Boys Markets,* the Second Circuit in *Hoh* adds the element of "some likelihood of success." 491 F.2d at p. 561. In the case at bar, the Union complains of the insertion of that element, pointing out correctly that it was not mentioned specifically by the Supreme Court; but I am of course bound by the Second Circuit's recitation of the elements necessary to obtain injunctive relief.

The stage is now set for the Supreme Court's decision in *Buffalo Forge, supra.* The Company in the case at bar contends that the effect of that decision so limits *Boys Markets* and its underlying rationale that injunctions under § 301(a) actions are simply no longer available against employers, except to the extent that the union can meet the strict requirements of § 7 of the Norris-LaGuardia Act.[23]

I do not so construe *Buffalo Forge.* The case represents, in effect, a refusal by the Supreme Court to apply the *Boys Markets* exception to the precise facts presented in *Buffalo Forge.* In *Buffalo Forge,* the employer, invoking § 301(a), sought to enjoin a sympathy strike called by its employees in aid of another union's efforts. Mr. Justice White, in the opening paragraph of his majority opinion, poses the issue:

"The issue for decision is whether a federal court may enjoin a sympathy strike pending the arbitrator's decision as to whether the strike is forbidden by the express no-strike clause contained in the collective-bargaining contract to which the striking union is a party." 428 U.S. at p. 399, 96 S.Ct. at p. 3143, 92 LRRM at p. 3033.

---

**22.** In *United States Steel Corp. v. United Mine Workers of America, supra,* cited with approval in *Hoh v. Pepsico, Inc.,* Judge Gibbons' opinion observes:

"In expressly overruling its earlier decision in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), and in approving the analysis of the *Sinclair* dissent, the Supreme Court worked out a careful and narrow accommodation between the earlier Norris-LaGuardia Act and the later Labor-Management Relations Act. It held only that the express prohibitions against certain specific injunctions contained in § 4 of Norris-LaGuardia, 29 U.S.C. § 104, were deemed not to bar injunctions necessary to accomplish the purposes of the Labor-Management Relations Act through contract arbitration. The Court very carefully in Part V of the opinion, 398 U.S. at 253–255, 90 S.Ct. 1583, made clear that it was dealing only with the prohibitions of § 4 of Norris-LaGuardia, and then only in cases where the court first holds that a strike is over a grievance which both parties are contractually bound to arbitrate. The opinion says nothing about the procedural steps which must be taken in making that determination or about the safeguards which must surround the issuance of a preliminary injunction." 456 F.2d at p. 487.

The case holds that the procedural requirements of § 7 of Norris-LaGuardia are applicable to actions commenced under § 301(a) of the Labor Management Relations Act.

**23.** That is to say, the Union must demonstrate that the Company's acts are "unlawful", an impossibility in the case at bar, since the requisite elements of violence, criminality or fraud are missing.

Referring to the opinion below,[24] the Court said of the Second Circuit's decision:

"It held that enjoining this strike, which was not 'over a grievance which the union has agreed to arbitrate,' was not permitted by the *Boys Markets* exception to the Norris-LaGuardia Act." 428 U.S. at p. 403, 96 S.Ct. at p. 3145, 92 LRRM at p. 3034.

After an extensive discussion of *Boys Markets,* the Court concludes in *Buffalo Forge:*

"We agree with the Court of Appeals that there is no necessity here, such as was found to be the case in *Boys Markets*, to accommodate the policies of the Norris-LaGuardia Act to the requirements of § 301 by empowering the District Court to issue the injunction sought by the employer." 428 U.S. at p. 412, 96 S.Ct. at p. 3149, 92 LRRM at p. 3038.

While, as I have said, the Court's discussion in *Buffalo Forge* is extensive, its rationale is relatively narrow. The sympathy strike in *Buffalo Forge* was not subject to an injunction because it was not over a grievance which the union had agreed to arbitrate. That rationale appears clearly from the following observation in the majority opinion:

"The issue in this case arises because the employer not only asked for an order directing the Union to arbitrate but prayed that the strike itself be enjoined pending arbitration and the arbitrator's decision whether the strike was permissible under the no-strike clause. Contrary to the Court of Appeals, the employer claims that despite the Norris-LaGuardia Act's ban on federal court injunctions in labor disputes the District Court was empowered to enjoin the strike by § 301 of the Labor Management Relations Act as construed by *Boys Markets, Inc. v. Retail Clerks Union,* supra. *This would undoubtedly have been the case had the*

*strike been precipitated by a dispute between union and management that was subject to binding arbitration under the provisions of the contract.* In *Boys Markets*, the union demanded that supervisory employees cease performing tasks claimed by the union to be union work. The union struck when the demand was rejected. *The dispute was of the kind subject to the grievance and arbitration clauses contained in the collective-bargaining contract,* and it was also clear that the strike violated the no-strike clause accompanying the arbitration provisions. The Court held that the union could be enjoined from striking over a dispute which it was bound to arbitrate at the employer's behest." 428 U.S. at p. 405, 96 S.Ct. at p. 3146, 92 LRRM at p. 3035. (emphasis added).

■ In the case at bar, the Company's conduct in respect of transfers has given rise to a dispute which is undoubtedly—nay, concededly—"subject to the grievance and arbitration clauses contained in the collective-bargaining contract." Thus there is no basis for application of what may be characterized as the "Buffalo Forge" exception to the "Boys Markets" exception.[25]

Relying upon broad language which appears in the body of the *Buffalo Forge* opinion, the Company in the case at bar contends that injunctions against employers of the kind contemplated (although not granted on the facts) in *Hoh v. Pepsico, Inc., supra,* can no longer be given. But I decline to extend the holding of *Buffalo Forge* beyond the precise question presented, at least until I am directed by higher authority to do so.

■ I perceive no justification for a more broad application of *Buffalo Forge.* As noted, in *Boys Markets* the Court sought to reconcile and accommodate the anti-injunc-

---

24. 517 F.2d 1207 (2d Cir. 1975).

25. There is no merit to the Company's contention that the Union is not entitled to injunctive relief because its complaint does not include a specific demand for arbitration. All *Boys Markets* requires is that the party seeking injunctive relief be "ready to proceed with arbitration

at the time an injunction . . . was sought and obtained." 398 U.S. at p. 254, 90 S.Ct. at p. 1594. The Union stands on that posture in the case at bar; furthermore, it has commenced the grievance procedure. Flanagan, 122.

tion strictures of Norris-LaGuardia to the subsequently enacted jurisdictional remedies of the Labor Management Relations Act. In *Boys Markets* that accommodation took the form of sanctioning an employer's injunction against a strike, notwithstanding the strictures of § 4 of Norris-LaGuardia, where the strike arose out of a dispute the union had agreed to arbitrate. But surely the process of accommodation and reconciliation is a two-way street. In the case at bar, the Union seeks an injunction of Company actions arising out of an arbitrable dispute, notwithstanding the strictures of § 7 of Norris-LaGuardia. Such a remedy is consistent with the rationale of *Boys Markets,* and is not foreclosed by *Buffalo Forge,* which *au fond* does no more than decline to apply the *Boys Markets* result to a sympathy strike.

Accordingly I conclude that a union may still obtain injunctive relief against an employer if it can bring itself within the equitable requirements delineated in *Hoh v. Pepsico, Inc., supra.* To that question I now turn.

### III.

■ The combined teaching of *Boys Markets* and *Hoh v. Pepsico* is that the Union, to obtain injunctive relief in aid of arbitration, must demonstrate the following elements:

(1) The parties are contractually bound to arbitrate the dispute in question.

(2) The Union has "some likelihood of success" in prevailing on the merits.

(3) Breaches of contract by the Company are occurring and will continue, or have been threatened and will be committed.

(4) These breaches have caused or will cause irreparable injury to the Union or its members.

(5) The Union or its members will suffer more from the denial of an injunction than will the Company from its issuance.

In the case at bar, first and third elements are clearly present. The dispute is concededly arbitrable; and, assuming *arguendo* that the Company's transfers of employees in derogation of seniority constitute breaches of contract, their effect is continuing [26] and more transfers are promised (or threatened, depending on one's point of view) for the future.[27]

■ We come, then, to the first disputed element: Whether the Union has "some likelihood of success" in convincing the arbitrator of its construction of the contract. Addressing itself to that element, the Second Circuit in *Hoh* adopted Judge Frank's "liberal formulation" in *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953):

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

I conclude, in the case at bar, that the Union has satisfied this element. The Union contends that the Company is deliberately manipulating its transfers of employees, in order to prevent any additional employees from attaining ten years' seniority, and thereby becoming more difficult for the Company to deal with in respect of future layoffs.[28]

---

**26.** That is particularly so with respect to senior, laid-off employees in the transfer receiving area whose two-year recall periods are about to run out. See discussion at p. 979 *infra.*

**27.** Defendant's Ex. G.

**28.** Murray affidavit, para. 23; Flanagan affidavit, para. 9. Flanagan, president of the New York local, testified that at a meeting in North Carolina in October, 1976, Company officials made known their policy that "they didn't want anybody back on the rolls that would *require* [*sic,* probably 'acquire'] ten years service." 117.

The Company denies that its transfers, past or intended, are so motivated; but it takes the position that such motivation would be permissible under the contract. The arbitrator may find against the Company on the facts, in respect of motivation, and find for the Union that such a manipulation of the transfer options does unacceptable violence to seniority concepts in the contract. I intimate no view on how these questions should be resolved. That is not the Court's function. What I do decide is that the Union's contentions raise questions of sufficient substance to make them "a fair ground for litigation", *Hamilton Watch Co. v. Benrus Watch Co., supra.* In consequence, the Union satisfies the requirement of demonstrating "some likelihood of success".

Thus we come to the crucial elements of irreparable harm. It is in regard to these elements that the Union has failed to persuade me that it is entitled to injunctive relief at this time.

While the Union argues generally that the presence of allegedly illegal transferees, and the importation of others, brings about a demoralizing effect upon the laid-off employees, this concept is far too vague and speculative to form the foundation for equitable relief. The only arguable source of irreparable injury present in this case, in respect of Union members, has to do with laid-off employees whose two-year recall periods are about to elapse. That injury may well be irreparable, since once an employee falls off the precipice of that two-year recall period, his status and rights under the contract come entirely to an end; and the Company, during the course of the hearing, made it quite clear that it does not concede the power of an arbitrator to direct the reinstatement of such an employee to the recall list, since, or so the Company might argue, such a remedy would exceed the arbitrator's powers. Accordingly, the Court must conjure with the following hypothetical situation: The arbitrator accepts the Union's construction of the contract; he directs transfers to cease, and transferred employees to be returned to their areas of origin; and that, in consequence, the Company's needs within the receiving area necessitate the recall of laid-off employees. If, during the interim of the arbitration proceedings, a laid-off employee passed beyond the two-year period of recall, he would have suffered an irreparable injury.

The Company says that all this is impossibly remote and speculative, particularly in view of the Company's other options, in addition to recalling laid-off employees.[29] But the finality of the passing of the two-year recall period unquestionably introduces an element of irreparable injury to the employees concerned.

However, an obstacle to the Union's effort to obtain injunctive relief at this time arises from the fact that such irreparable injury is not imminent. The Company introduced into evidence at the hearing a chart summarizing the temporary transfers which are involved in this litigation.[30] The irreparable injury to which I have just alluded arises only in those receiving areas where two factors combine: (1) transferees are sent in who are junior to laid-off employees; and (2) the two-year recall period of those senior, laid-off employees expires. Analysis of the chart, when studied together with data compiled by the Union,[31] reveals that this particular combination of circumstances will first occur on May 30, 1977. The laid-off employees in question are senior to employees transferred into the Alabama/Kentucky/Tennessee area from Florida; and these particular senior employees (40 in number) were laid off on May 30, 1975. In consequence, their recall period expires on May 30, 1977. All other senior employees, currently on layoff, who might stand to benefit from an arbitrator's award in the Union's favor were laid off

29. For example, the Union could have no objection if the Company transferred in an employee *senior* to the qualified laid-off employees in the receiving area.

30. Ex. G.

31. Exhibit B to the complaint.

subsequent to May 30, 1975, so that their periods of recall have longer to run.

■ It is by no means clear to the Court that an expedited arbitration cannot resolve the underlying question of contractual construction prior to May 30, 1977. Accordingly I perceive no need for the injunctive relief prayed for by the Union.[32]

■ That is particularly so, in view of the fact that I accept the Company's evidence that barring further transfers, or requiring the return of transferees, at this time would work irreparable injury to the Company. Mr. Clancy, the Company's witness, testified that, in the nature of the installing operation, taking installers off partially completed projects and bringing new people in is disruptive. In addition, it is apparent from the evidence that a number of the transferees have special skills relating to the Company's new equipment, and that the procurement of substitutes, if the injunction was issued, might prove difficult. It is true, as the Union contends, that Mr. Clancy in his evidence could not give many specifics in respect of jobs currently in hand; but I have no difficulty, on the basis of the evidence before me, in drawing the inference that serious disruption of the Company's operations might occur if the injunction, in the terms prayed for by the Union, was granted at this time.

Furthermore, the possibility exists that the return of employees transferred from Florida, who were surplus in that area, would again cause them to become surplus in Florida, leading to their own layoff. Possible injury to others is a legitimate source of concern for the Court sitting in equity.

In these circumstances, and in the exercise of my discretion, I decline to grant the preliminary injunction prayed for by the Union. *Hoh v. Pepsico, Inc., supra; Distillery Workers v. Hyram Walker,* 88 LRRM 3127 (S.D.N.Y.1975), *aff'd,* 90 LRRM 2889 (2d Cir.).

## IV.

■ In this proceeding, the Court, sitting as a chancellor of equity, is armed with the chancellor's invisible but flexible wand. Concluding, as I have,[33] that I am not foreclosed from giving equitable relief in this case, I may therefore consider what, if any, appropriate instructions may be given to the parties at the present time, even if the relief prayed for by the Union is denied.

It is apparent that an expedited arbitration is essential in this matter. The parties have expressed willingness to waive the pre-arbitration grievance procedures; the Court intends to enforce that agreement in its order. The parties will thus be directed to proceed to arbitration forthwith; and the case will be called for further conference before this Court on May 16, 1977, at which time the status of the arbitration proceedings will be reviewed, and further consideration given to injunctive relief.

In these circumstances, the order of this Court is as follows:

(1) The parties, in accordance with Article 8 of the contract, shall meet in an effort to agree on the person to be selected as arbitrator, such meeting to take place not later than March 30, 1977.

(2) If, prior to or upon such date, the parties have concluded that they cannot agree on the person to be selected as arbitrator, they are directed to make immediate

32. I am not influenced by the Company's argument that the Union delayed so long in seeking arbitration that equity forecloses injunctive relief. It is apparent from the evidence that, while the Company indicated the possibility of such transfers some months ago, it then attempted to avoid a confrontation by means of other options. Clancy, 216. The first transferees involved in this litigation were transferred in January, 1977. Company and Union representatives were in constant communication with each other about the problem; there was another meeting in early March. The Union's locals had to brief the national's officers; some locals did in fact file grievances; the complaint was filed on March 11, 1977. Under the circumstances, it cannot be said that the Union so delayed the pursuit of its remedies that it must be denied equity for that reason.

33. See Point II, *supra.*

application to the Federal Mediation and Conciliation Service or the American Arbitration Association, for designation of an arbitrator, as provided for by Article 8 of the contract.

(3) Once an arbitrator has been designated, the parties are directed to proceed to arbitration forthwith, and to exercise their best efforts to obtain the agreement of the arbitrator to render an award within seven days of the final submissions to him.

(4) The parties are directed to notify the Court immediately if any additional transfers, *not* referred to in the evidence, are effectuated or scheduled which would send "junior" employees into areas where senior employees are laid off, and whose two-year recall period will expire *prior* to May 30, 1977.

(5) Any departure by either party from the letter or spirit of this order will be taken into consideration in any subsequent application for equitable relief.

(6) This case will be called for further conference before this Court on May 16, 1977, at 4:30 p.m. in Room 312.

It is So Ordered.