The **TEXACO INDEPENDENT UNION OF the CORAOPOLIS TERMINAL by Harry R. Lewis, Trustee ad Litem, Plaintiff,**

v.

**TEXACO, INC., Defendant.**

Civ. A. No. CA 78–77.

United States District Court,
W. D. Pennsylvania.

April 13, 1978.

On Requests for Injunctions July 10, 1978.

Jon Hogue, Kaufman & Harris, Pittsburgh, Pa., for plaintiff.

Donald T. O'Connor, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

The parties have filed Cross Motions for Summary Judgment in this proceeding brought by Texaco Independent Union (Union), representative for the bargaining unit at Texaco's Coraopolis Terminal, against Texaco, Inc. (Company). The Union seeks to compel Texaco to maintain the status quo ante pending arbitration of disputes over a series of unilateral changes at the Pittsburgh Plant as to the assignment of overtime work, the contracting of work tra-

ditionally done by union members, changes in work schedules, wages, hours and conditions, and the imposition of discipline for violations thereof. The Motions will be denied.

The Collective Bargaining Agreement runs from June 1, 1976 through May 31, 1979. The Pittsburgh Plant is engaged in the receiving, distributing, and storing of petroleum products and employs truck operators, auto mechanics, warehousemen, compound testers, lab technicians, truck washers and greasers. The Agreement is styled "Union Agreement Between Texaco, Inc. (Marketing Department-US) Northeast Region and the Texaco Independent Union of Coraopolis Terminal Covering Truck Operators, Auto Mechanics, Warehousemen, Compounder-Testers, Lab Technicians, Truck Washers and Greasers at Coraopolis, Pennsylvania" and states:

"The Company, through its appointed representatives, will receive the bona fide representatives of the Union as the exclusive representatives of all of the said employees for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment."

The Agreement also provides:

"Ordinarily, such assignment [to duties] shall be within the classification which the employee is working."

A work week is to be 40 hours, and no employee can be required to work for more than 16 continuous hours without a rest period of 8 hours. Time and a half is to be paid for hours in excess of the daily 8 hours scheduled, or in excess of 40 hours in any work week, or on Sundays, except that all hours paid for at time and a half for work performed in excess of an employee's scheduled hours are to be excluded in computing hours worked in excess of 40. Layoffs by the Company, "insofar as practical", are to be guided by the "ability and efficiency" of the employee involved, and to be "in the inverse order of their employment". Seniority begins after a period of 120 consecutive days of employment, and employees are grouped in six categories for purposes of seniority.

As part of the Agreement, the Company reserves the right to discharge or suspend any employee for cause. If an employee believes himself to have been injured or treated unfairly by the Company by reason of the application of any of the provisions of the Agreement, he may (Article XII, mislabeled XIII):

1. Within 15 days make a complaint to his immediate supervisor.

2. If satisfaction is not obtained within 48 hours, refer the matter within 7 days to the Plant Manager, who shall render a decision within 7 days.

3. Within 10 days of receipt of the decision of the Plant Manager, appeal to the Regional Manager of the Northeast Region who shall, within 10 days, render a decision in writing.

4. If still dissatisfied, within 14 calendar days thereafter, notify the Regional Manager of his desire to submit the matter to a Board of Review setting forth the particular provisions of the Agreement which have allegedly been violated, "it being understood that the jurisdiction of the Board of Review is expressly limited to the application of the Articles of this Agreement." The Board of Review consists of a member selected by the grievant or his representative, one selected by the Regional Manager, and one by the two so selected. The two so selected jointly request the Director of the Federal Mediation and Conciliation Service to submit the names of five persons, two of whom are eliminated by each representative; the remaining person becomes the third member of the Review Board.

The parties also make the following commitment (Article XI):

"*STRIKES AND LOCKOUTS*

"The employes shall, at all times, comply · with the Company rules consistent with this Agreement, and shall perform their work efficiently and courteously and shall foster the Company's business. While this Agreement is in effect, the Company agrees that there will be no lockout and the Union agrees there will

be no strike, sit-down, or stoppage of work."

It appears that on or about September 14, 1977, at a meeting with its employees, Company officials announced plans to decrease its work force, to eliminate altogether the job category of "auto mechanic", and to alter the work shifts of union members in accordance with a major reorganization of Texaco's Marketing Division, which includes the Pittsburgh Plant. The Union contends (Lewis Affidavit) that some warehousemen were required to work in excess of 40 hours overtime per week, against their wishes and under threats of discharge (as was Albert Lengvarsky, who claimed he was physically unable to work overtime). Some work previously performed by union members was contracted out, and vacant positions were eliminated (Affidavit of George E. Rogers, Plant Manager).

On November 2, 1977, the Company formally advised the Union of the changes announced at the September 14th meeting. By December 1, 1977, its position was that it could unilaterally implement the changes. The Union insists that all matters were subject to bargaining. While the reorganization process was going on, no work schedule had been posted for bid in October as required by the Contract and, when the Union objected, a schedule was posted for November, but no employees signed up. The Company threatened to institute a disciplinary procedure when an employee refused to work his newly assigned shift. While it was not necessary to utilize the procedure, some employees refused overtime that the Company maintained was essential to the operation of the Pittsburgh Plant (Rogers Affidavit), and a disciplinary procedure was developed which was utilized by the Company, short of discharge.

On December 30, 1977, the Union filed an unfair labor practice charge against the Company with Region Six of the National Labor Relations Board. (Henry Shore, Regional Director of the National Labor Relations Board (NLRB) informed the Union on March 3, 1978 that it was refusing to issue a complaint. An appeal has been taken to the General Counsel of the NLRB.) On January 6, 1978, the Union filed the instant action in the Court of Common Pleas of Allegheny County, Pennsylvania. Hearing was held by Judge Marion K. Finkelhor on January 23rd on the Union's Motion for Preliminary Injunction. The Company advised Judge Finkelhor at that time of its intention to remove the action to the District Court pursuant to Section 1441 of the United States Code, 28 U.S.C. § 1441, and made several motions for dismissal. Judge Finkelhor took the matters under advisement, but directed the Union to proceed with its case. The Union thereupon presented the testimony of two witnesses and rested, and Court was recessed. Prior to any rulings, the action was removed to this Court and an Answer asserting various defenses was filed on February 6, 1978. The Union filed a Motion for Preliminary Injunction on February 7th, and on February 22nd the Company filed its Motion for Summary Judgment. On February 23, 1978, the Union filed a Cross Motion for Summary Judgment and a Motion for Peremptory Writ claiming that it is suffering immediate and irreparable injury and seeking injunctive relief to maintain the status quo ante at the Coraopolis Terminal.

While these activities were going on, grievances utilizing the contractual disputes resolution process were filed on January 24, 1978 over disciplinary suspensions for refusal to work overtime.

At the argument in this case, all counsel agreed that the Contract required submission of substantively arbitrable issues to arbitration. When, however, the Court requested they take a few days to see if the matter could be expedited through such procedures, the Company rejected certain grievances as being procedurally irregular, and the Union was not satisfied that its claimed irreparable harm could be compensated through an arbitrator's award. The Court's effort was rejected.

It is the Company's position that "[A]pparently unsatisfied with the Company's promise to arbitrate, the Union now petitions this Court for a privilege it has

not obtained through collective bargaining: maintenance of the status quo ante pending the arbitrator's decision through a preliminary injunction and reinstatement of the parties to the position the Union alleges they held prior to the Company's claimed contractual breaches." The Union says "[T]he Company has unilaterally changed the shifts and work schedules of the union members. According to past practices and agreements between the Company and the Union, employees at the Pittsburgh Plant have worked four ten-hour days. The new schedule imposed by the Company requires Union members to work five eight-hour days. Unlike the former work schedule, the new schedule results in some Union members being left alone in hazardous areas." The Union also says "[T]he new policies regarding overtime have caused severe disruption in the lives of the Union members."

## I. THE APPLICABLE LAW

Under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, this Court has jurisdiction over "suits for violation of contracts between an employer and a labor organization". Nor is there any doubt that, in some circumstances, this jurisdiction extends to the use of equitable powers to grant injunctions against contract violations. See *Milk and Ice Cream Drivers and Dairy Employees Union, Local No. 98 v. Gillespie Milk Products Corp.,* 203 F.2d 650 (6th Cir. 1953). Thus, in *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 249, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199, 209 (1970), Justice Brennan, expressing the views of the five Members of the Court, stated:

"Even if management is not encouraged by the unavailability of the injunction remedy to resist arbitration agreements, the fact remains that the effectiveness of such agreements would be greatly reduced if injunctive relief were withheld. Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strike, lockouts, or other self-help meas-

ures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate."

The Company in its brief agrees that the assignment of mandatory overtime, the unilateral altering of work schedules, the hiring of non-union employees as outside contractors to do work traditionally performed by union members would all be substantively arbitrable, but denies that the Union's allegation of failure to replace workers who have retired, and the establishment of work rules and/or regulations are matters that are subject to the arbitration provision. Therefore, they claim that the Union's Motion for Preliminary Injunction must be denied.

The Union, however, contends that the unilateral changes in terms and conditions of employment, while not subject to the explicit provisions of the Collective Bargaining Agreement, are barred by an established pattern of past practices at the plant which are also part of the Contract. They cite *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409, 1417–18 (1960), where Justice Douglas stated:

"The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in her personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in

using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

This case involves Cross Motions for Summary Judgment, and summary judgment is proper only when "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "Summary judgment may not be granted where there is the slightest doubt as to the facts." *Tomalewski v. State Farm Insurance Co.,* 494 F.2d 882, 884 (3rd Cir. 1974). "Any doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. Documents filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist and *not* to decide the fact issues themselves." *Krieger v. Ownership Corp.,* 270 F.2d 265, 270 (3rd Cir. 1959). *Accord Janek v. Celebrezze,* 336 F.2d 828 (3rd Cir. 1964), cited with approval in *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3rd Cir. 1971). The burden of demonstrating the justification for a motion for summary judgment lies with the movant. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 153–161, 90 S.Ct. 1598, 26 L.Ed.2d 142, 151–156 (1969).

After considering all of the inferences flowing from the facts as set forth in the various affidavits, we can only conclude that there are genuine issues of fact as to the merits of the dispute. In the written Agreement, the Company is authorized to change an employee's work schedule "due to unforeseen circumstances", and it is also provided that "such changes will be kept to a minimum". Whether or not a particular change of work schedules and overtime here involved were within plant practices cannot be determined from the affidavits. While the Union argues that a change of the number of trucks operated, with excess work to be contracted out, is directly contrary to the past practices of the plant, there are no facts alleged to sustain this contention.

An example relates to the existence of disciplinary policy to bring about compliance with the Company's unilateral changes. It may well be that proof will be forthcoming that the past practices of the plant govern the nature and type of discipline involved. A search of the affidavits, however, fails to provide guidance on this matter or on questions relating to overtime and irreparable harm. Triable issues would therefore exist as to the breadth and scope of the Contract in terms of contract obligations which can not be decided on this abbreviated record. Before a preliminary injunction can be granted there must be a strong showing of probable success on the merits, and inquiry is essential at this time, not to usurp the arbitrator's function of determining the contractual provisions but solely to determine what, if any, plant practices prevail which point to a likelihood of success on the merits.

This brings us to the Company's contention that this Court does not have the power to preliminary or permanently enjoin the Company's action or to order it to restore the status quo ante. Section 7 of the Norris-LaGuardia Act sets strict requirements for this Court to. exercise jurisdiction to grant injunctive relief in any case "involving or growing out of a labor dispute," including that the Court find "(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained." [1] (29 U.S.C. § 107(a)). In the wake of *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199, 212 (1970), however, courts were liberal in granting injunctions to preserve the status quo pending arbitration despite the fact the Court emphasized its holding was a "narrow one" and did "not undermine the vitality of the Norris-LaGuardia Act." *Hoh v. Pepsico, Inc.,* 491 F.2d 556 (2d Cir. 1974); *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.,* 529 F.2d 1073 (9th Cir. 1976), *vacated and remanded* 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976), *reversed on remand* 550 F.2d 1237 (9th Cir. 1977), *cert. denied* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). These courts reasoned that the Supreme Court's efforts to reconcile the policies of Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) and the strictures of Section 4 of the Norris-LaGuardia Act (29 U.S.C. § 104) were equally applicable to Section 7 of Norris-LaGuardia. See *United States Steel Corp. v. United Mine Workers,* 456 F.2d 483 (3rd Cir. 1972), *cert. denied* 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972), in which the Court held that the procedural aspects of Section 7 were applicable in an injunction request brought under Section 301, but that all of the findings of fact required by Section 7 might not be necessary; *Celotex Corp., Pittston Plant v. Oil, Chemical and Atomic Workers International,* 516 F.2d 242 (3rd Cir. 1975).

This Court, however, must examine the Union's Motion for an injunction in light of *Buffalo Forge v. United Steel Workers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In fact, the Supreme Court vacated and remanded in *Greyhound Lines v. Amalgamated Transit Union, supra,* expressly for the purpose of allowing the Ninth Circuit to reconsider its opinion in light of *Buffalo Forge.* That Court, in turn, reversed itself and the District Court's grant of an injunction, which it had previously affirmed, and which compelled an employer to maintain the status quo pending arbitration. *Greyhound II, supra,* 550 F.2d 1237.

One District Court has refused to apply *Buffalo Forge* in a similar fact situation, *Communications Workers v. Western Electric Company,* 430 F.Supp. 969 (S.D.N.Y. 1977), holding that *Buffalo Forge* dealt with injunctions of sympathy strikes only and does not restrict a district court's power to freeze the status quo pending completion of arbitration.[2] The Plaintiff here urges us to limit application of *Buffalo Forge* to the narrow issue of sympathy strikes "since the Supreme Court evidenced no intention to withdraw its decision in *Boys Market.*"

We believe that such a narrow construction of *Buffalo Forge* is unjustified because the Supreme Court in that case reiterated that *Boys Markets* constituted a narrow exception to national labor law policy as expressed by Congress in Norris-LaGuardia.[3] It would also require this Court to

**1.** Plaintiff does not allege violence on the part of the Defendant or any other actions constituting "illegal" acts under Norris-LaGuardia. *Wilson & Co. v. Birl,* 105 F.2d 948, 952 (3rd Cir. 1939); *United States Steel Corp. v. United Mine Workers,* 320 F.Supp. 743, 745 (W.D.Pa. 1970) (dictum).

**2.** An extensive critique of *Buffalo Forge* and an analysis of its impact on the question before this Court is contained in Gould, On Labor Injunctions Pending Arbitration: Recasting *Buffalo Forge,* 30 Stanford L.Rev. 553 (February 1978).

**3.** The Court in *Boys Markets* concluded that the absence of injunctive relief removed the incentive for employers to agree to arbitration arrangements, and that damage actions in response to strikes over arbitrable grievances tended to aggravate industrial strife and to delay resolution of disputes between labor and

overlook the following broad statements of policy against any consideration of the merits of an arbitrable dispute by a court (428 U.S. at 410–11, 412, 96 S.Ct. at 3148–49, 49 L.Ed.2d at 1032–3):

> "If an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express prohibitions of § 4. The court in such cases would be permitted, if the dispute was arbitrable, to hold hearings, make findings of fact, [f. n. omitted] interpret the applicable provisions of the contract and issue injunctions so as to restore the status quo or to otherwise regulate the relationship of the parties pending exhaustion of the arbitration process. This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective bargaining contracts, [f. n. omitted] not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets,* but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act.

> \*   \*   \*   \*   \*   \*

> With these considerations in mind, we are far from concluding that the arbitration process will be frustrated unless the courts have the power to issue interlocutory injunctions pending arbitration in cases such as this *or in others in which an arbitrable dispute awaits decision.*" [Emphasis added]

management. Most important, the Court said, "The basic purpose [of an arbitration arrangement] is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate." 398 U.S. at 249, 90 S.Ct. at 1591, 26 L.Ed.2d 1995. Thus, the sole rationale for *Boys Mar-*

See: *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403, 1407 (1960).

■ Just as the Supreme Court could find no basis for inferring an obligation not to engage in sympathy strikes from the union's agreement to submit disputes between the company and the union to arbitration, so this Court cannot infer from an agreement to arbitrate disputes that the Company necessarily undertook to preserve the status quo ante pending arbitration. As the Ninth Circuit stated in its second opinion in *Amalgamated Transit v. Greyhound, supra,* 550 F.2d at 1238–9 (*Greyhound II*):

> "The same reasoning applies to the facts of this case. An undertaking to preserve the status quo pending arbitration would be to Greyhound what an undertaking not to strike would be to a union. The promisee of each undertaking would obtain its benefits in exchange for a consideration furnished by it. In this case, however, the Union's promise to submit the dispute to arbitration and not to strike could not have been given in exchange for an express promise by Greyhound to preserve the status quo because no such promise was made.

> Moreover, no basis exists for finding such a promise implied in fact. While a promise to submit a dispute to arbitration may justify a finding of an implied duty not to strike, *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), such a promise does not imply a duty on the part of the employer to preserve the status quo pending arbitration. The source of this difference is that a strike pending arbitration generally will frustrate and interfere with the arbitral process while the employer's altering the status quo generally

*kets* was that injunctions against strikes over arbitrable grievances were, as the Court stated in *Buffalo Forge,* "essential to carry out promises to arbitrate and to implement the private arrangements for the administration of the contract." 428 U.S. at 411, 96 S.Ct. at 3149, 49 L.Ed.2d 1033.

will not. The implication of a duty not to strike may be essential to carry out promises to arbitrate and to implement the private arrangements for the administration of the contract. *Buffalo Forge Co. v. United Steel Workers of America, supra,* 428 U.S. at 411, 96 S.Ct. at 3149." Whether, in light of past practices, the Company's promise to arbitrate included a promise not to disturb the status quo ante pending final arbitration may itself be arbitrable under Article XII. That, however, does not affect our decision in this case. This Court would have no more justification for granting an injunction pending resolution of that question than it would in enjoining a sympathy strike pending an arbitrator's determination of whether a sympathy strike is barred by a general no-strike clause. Granting an injunction, even for the limited purposes of this case, would require some examination of the merits of the dispute between the parties, even though the Court's inquiry would be directed only to the traditional equitable prerequisites for preliminary and permanent injunctions, such as whether the petitioner has shown probable success on the merits or irreparable harm. Therefore, the type of injunction requested by the Union might well contravene the policies of *Buffalo Forge.*

In addition, in *Buffalo Forge* the Supreme Court held that the quid pro quo for the company's promise to arbitrate was the union's promise not to strike over arbitrable grievances. 428 U.S. at 407, 96 S.Ct. at 3147, 49 L.Ed.2d at 1030. In the instant case, the Collective Bargaining Agreement contains a no-strike clause (Article XI) and a clause setting up grievance machinery (Article XII), but there is no express promise by the Company to maintain the status quo pending arbitration given in exchange for the Union's promise not to strike. *Buffalo Forge* is very similar to the instant case in that the Company was asking the Court to preserve the status quo, i. e. pre-

vent the sympathy strike, pending arbitration of the question of whether such a strike was a violation of the contract. The Court there said, "The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain." 428 U.S. at 408, 96 S.Ct. at 3147, 49 L.Ed.2d at 1031. The fact situation in the instant case is the inverse of the one in *Buffalo Forge.* Here the Union is asking the Court to preserve the status quo. Applying *Buffalo Forge* principles, we conclude the Union is not deprived of its bargain by the Company's refusal to preserve the status quo ante since the Union is still entitled to arbitrate the issues.

This brings us, however, to an important exception to the rule barring injunctions to preserve the status quo ante. The primary concern of the Court in *Buffalo Forge* was that involvement of the courts in labor disputes would undermine the policy in favor of labor arbitration. Therefore, if the failure to grant an injunction would render arbitration meaningless, the logic of *Buffalo Forge* would require the Court to consider whether the status quo should be preserved pending arbitration. Thus, the Fourth Circuit in *Lever Brothers Co. v. International Chemical Workers, Local 217,* 554 F.2d 115 (4th Cir. 1976), upheld a district court's preliminary injunction which prevented the company from permanently transferring its plant from Baltimore, Maryland to Hammond, Indiana. The Court reasoned that, in contrast to the situation in *Buffalo Forge* and *Greyhound II,* if the union there failed to obtain an injunction, it could win "but an empty victory" by prevailing in arbitration since the move to Indiana would be "a fait accompli", and the union would then have the burden of persuading the company to move its plant back to Maryland.[4] The Court provided the following succinct formulation of the applicable standard in these cases (554 F.2d at 123):

4. The threat of a plant closing or transfer has frequently been the basis for injunctions preserving the status quo pending arbitration. *See e. g.: Local Union No. 328 v. Armour and*

*Company,* 294 F.Supp. 168 (W.D.Mich.1968); *Local Div. 1098 v. Eastern Greyhound Lines,* 225 F.Supp. 28 (D.D.C.1963).

"An injunction to preserve the *status quo* pending arbitration may be issued either against a company or against a union in an appropriate *Boys Markets* case where it is necessary to prevent conduct by the party enjoined from rendering the arbitral process a hollow formality in those instances where, as here, the arbitral award when rendered could not return the parties substantially to the *status quo ante*."

We believe that the Union in the instant case must be given an opportunity to demonstrate whether the Company's actions would render the arbitral process a "hollow formality" and that genuine disputes of material fact exist as to all of the Union's contentions. Therefore, the Motions of both the Company and the Union for Summary Judgment and the Union's Motion for Peremptory Writ will be denied, and a Hearing will be scheduled on the Union's Motion for Preliminary Injunction.

## ON REQUESTS FOR INJUNCTIONS

The Texaco Independent Union of the Coraopolis Terminal (Union) brought action in state court to enjoin Texaco, Inc. (Texaco) from changing its operations at the Terminal (where it receives, stocks, sells and distributes petroleum products) pending arbitration of whether the changes violated the collective bargaining agreement. After one day of hearing, and during a continuance thereof, the matter was transferred here. Cross Motions for Summary Judgment were denied, and the Requests for Preliminary and Final Injunctions were consolidated (see Fed.R.Civ.P. 65(a)(2)).

### I.

There was no dispute that the bargaining unit contained truck operators, who handled petroleum products; warehousemen, who handled their receipt, storage, and discharge; mechanics; compound blenders, who compounded different types of oil; laboratory technicians; and washer-greasers, who kept the trucks clean. For eleven years prior to 1977, the bargaining unit members worked four ten-hour shifts a week.

In early 1977, Texaco failed to replace a warehouseman and a washer-greaser who had retired. A meeting was called in September by company representatives, at which certain operational changes were announced, including a reduction of the work force by seven men; the complete elimination of the mechanic and truck operator positions with the mechanics' duties to be performed by outside contractors in the future. Changes were also proposed in the working hours of some employees, including initiation of an eight hour, five day work week for warehousemen and four of the truck drivers. In all, shift changes were made for 16 of the 30 employees. Overtime which had previously been assigned on a voluntary and equal basis, was made mandatory. (The company's overtime records, which were admitted into evidence, revealed that since December 19, 1977, most employees have continued to work less than fifty hours a week and the vast majority under 60 hours a week.) Discipline was imposed for refusal to work overtime when asked.

Grievances were filed over all these operational changes. The parties concede that arbitration is pending over the issue of discipline for refusal of overtime work. Texaco contends the grievances on the other matters are untimely, although arbitration is also pending on that issue. *See Wiley & Sons v. Livingston*, 376 U.S. 543, 558, 84 S.Ct. 909, 11 L.Ed.2d 898, 909 (1964).

Since the changes made in late 1977, there are fewer men assigned to work on barges at any one time and, at times, tanks are "gauged" without assistance. This requires a worker to climb to the top of a 49 foot tank and, if necessary, into the tank in order to measure the amount of product in the tank, and this practice is complained of as being unsafe. Complaints were also made to compulsory overtime as being unsafe.

### II.

After a review of the complete record in this case, the Court finds no justi-

fication for the issuance of an injunction. We held on the Summary Judgment Motions, and now reiterate, that an injunction to preserve the *status quo ante* pending arbitration could issue only on a showing that Texaco's actions would render the arbitration process a "hollow formality", i.e., conditions would be so changed that no arbitral award could substantially remedy the grievances, citing *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and the decision of the Ninth Circuit Court of Appeals in *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237 (1977), *cert. den.* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (*Greyhound II*), which was handed down after its first decision in the case was vacated and remanded by the Supreme Court for reconsideration in light of *Buffalo Forge.* *Lever Brothers Co. v. International Chemical Workers, Local 217*, 554 F.2d 115 (4th Cir. 1976), is an example of a situation in which arbitration would be a wholly inadequate protection for the rights of the parties (where the company planned to move its plant to another state) —a "fait accompli".

We believe, as the Union argues here, that a real and imminent threat to the safety of employees would also be a sufficient cause for issuance of an injunction because no arbitration award could compensate for loss of life or physical injury. In *United Steelworkers v. Blaw-Knox Foundry and Mill Machinery, Inc.*, 319 F.Supp. 636, 641 (W.D.Pa.1970), the late Judge Gourley of this Court enjoined a unilateral reduction of the number of employees manning an open hearth furnace pending arbitration, writing:

"However, to the extent that defendant's action in reducing the number of employees working at the open hearth furnaces threatens the health and safety of the employees working upon reduced crews, there is no adequate remedy at law or in arbitration, pending a decision by the arbitrator of the safety grievances filed."

*Cf. Pittsburgh Newspaper Printing Pressmen's Union No. 9 v. Pittsburgh Press Co.*, 343 F.Supp. 55 (W.D.Pa.1972), *aff'd* 479 F.2d 607 (3rd Cir. 1975) (request for preliminary injunction against shift reductions denied because grievants could be compensated by back wages); *Local Union 174, Utility Workers Union of America v. South Pittsburgh Water Co.*, 345 F.Supp. 52 (W.D. Pa.1972) (court refused to enjoin elimination of meal breaks); *Anheuser-Busch, Inc. v. Teamsters Local No. 633*, 511 F.2d 1097 (1st Cir.), *cert. den.* 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975) (appeals court reversed district court's grant of a preliminary injunction in a dispute over a company's ban on the wearing of tank tops, a type of sleeveless jersey, which, *inter alia*, prohibited the wearing of tank tops by employees in areas of the plant where they might be seen by the general public).[1]

Although we would encourage allowing employees to have assistance in "gauging" the tanks, we conclude there is no evidence that a current imminent health or safety hazard exists as a result of the changes in operations, overtime, or manpower which are at issue here. It is true that no arbitration award can compensate employees for any inconvenience Texaco's unilateral changes may cause. This type of burden alone, however, does not meet the standard for injunction outlined in *Lever Brothers,*

1. These, of course, are pre-*Buffalo Forge* decisions and are based on "irreparable injury" analysis. They do, however, show the special concern the courts have traditionally shown in injunction cases for the safety of employees. They also reflect the judgment that it would be anomalous to preserve the status quo where jobs are at stake, as in *Lever Brothers*, but not where life or health are endangered. *Injunctions Restraining Employers Pending Arbitration: Equity and Labor Policy*, 82 Dickinson L.Rev. 487, 504 n.111 (1978). In *United Steel-*

*workers of America v. Fort Pitt Steel Casting*, 452 F.Supp. 886 (1978), Judge Ziegler of this Court enjoined the defendant company from suspending payment of hospitalization and insurance premiums. Although his analysis of the effect of *Buffalo Forge* on prearbitration injunctions differs from ours, we agree with the result reached, since the suspension of health insurance protection could cause serious injury to employees that could not be remedied through arbitration.

*supra,* 554 F.2d 123, that arbitration will be rendered a "hollow formality" unless an injunction issues.

An appropriate order will be entered denying the Request for Injunction. This Opinion will constitute the findings of fact and conclusions of law required by Fed.R. Civ.P. 52(a).