TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 764, Plaintiff,

v.

BRANCH MOTOR EXPRESS COMPANY, Defendant.

Civ. No. 78–816.

United States District Court, M. D. Pennsylvania.

Oct. 11, 1978.

Ira H. Weinstock and James L. Cowden, Harrisburg, Pa., for plaintiff.

James A. Matthews, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM

NEALON, Chief Judge.

This action is brought pursuant to Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a).[1] Plaintiff contends that defendant has dispatched drivers out of their assigned regions in violation of the collective bargaining agreement currently in effect between the parties. Plaintiff requests a preliminary injunction restraining defendant from making such dispatches pending resolution of the matter through the grievance machinery set up under the collective bargaining agreement. Defendant argues that this Court does not have jurisdiction to grant the requested relief or, alternatively, that plaintiff is not entitled to a preliminary injunction under the circumstances. The evidentiary hearings required by the applicable statute[2] and rule[3] have been held and the requisite findings of fact[4] have been made. I conclude that this Court has jurisdiction to grant the requested relief but that plaintiff has not proven that its members will suffer irreparable harm as a result of being dispatched outside the region to which they have been assigned. Therefore, plaintiff's request for a preliminary injunction will be denied.

## FINDINGS OF FACT

1. Plaintiff, Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 764, is a labor organization within the meaning of the LMRA, as amended, and particularly Sections 2(5) and 301 thereof, 29 U.S.C. §§ 152(5) and 185.

2. Plaintiff has its principal office at 450 Beaver Street, Milton, Northumberland County, Pennsylvania.

3. Defendant, Branch Motor Express Company, is a motor carrier headquartered in New York City, and doing business in Pennsylvania by maintaining a trucking terminal at Milton, Pennsylvania.

1. Section 301(a) provides in pertinent part:
    Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C.A. § 185(a) (1965).

2. Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107.

3. Fed.R.Civ.P. 65(a).

4. See Fed.R.Civ.P. 52(a).

4. Defendant is an employer engaged in an industry affecting commerce within the meaning of the LMRA, and particularly Sections 2(2) and 301 thereof, 29 U.S.C. §§ 152(2) and 185.

5. Plaintiff is the duly recognized bargaining representative for the truck drivers at defendant's Milton terminal.

6. Plaintiff and defendant are parties to a national collective bargaining agreement, the "National Master Freight Agreement," and a local collective bargaining agreement, the "Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement." These agreements are effective for the period April 1, 1976 through March 31, 1979.

7. Article 8, section 6 of the National Master Freight Agreement provides in pertinent part as follows:

(a) Present terminals, breaking points or domiciles shall not be transferred or changed without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of Employer and Union representatives.

\* \* \* \* \* \*

(b) \* \* \* The Employer shall notify all affected Local Unions of [any] proposed change of operations at least twenty (20) calendar days prior to the hearing at the Joint Area Conference Committee . . ..

8. Defendant last received approval for a proposed change of operations from the Change of Operations Committee on July 29, 1974. The defendant's request for a change of operations at that time resulted from the acquisition by defendant of Motor Freight Company of Indiana on July 31, 1972.

9. Under the Change of Operations approved on July 29, 1974, the geographic area within which defendant operates is divided into three (3) regions. On April 1 of each year the truck drivers represented by plaintiff at the Milton terminal bid for assignments as either Region 1, Region 2 or Common Board drivers. Such assignments are made on the basis of seniority. The July 29, 1974 Change of Operations provides with respect to the assignments made to the Milton, Pennsylvania drivers as follows:

Milton, Pennsylvania drivers assigned to Region 1 will operate wholly within the perimeter of Region 1.

\* \* \* \* \* \*

Milton, Pennsylvania drivers assigned to Region 2 will operate wholly within the perimeter of Region 2.

\* \* \* \* \* \*

35% of the road drivers domiciled at Milton, Pennsylvania will be assigned as common board drivers and may operate within Region 1 or Region 2. A common board driver dispatched into a region must operate wholly within that region until returning to his home domicile. He may then be dispatched into another region. Milton domiciled common board drivers may operate only in Regions 1 and 2.

10. Drivers assigned to Region 2 enjoy a greater likelihood of returning home every other night than do Region 1 and common board drivers. On occasion, however, Region 2 drivers have spent three and sometimes four nights away from home while remaining wholly within the perimeters of Region 2. In addition, drivers are told when hired by defendant that they may have to remain away from home several nights a week.

11. On or about February 12, 1977, defendant acquired and began operating the Great Lakes Express Company under temporary authority of the Interstate Commerce Commission. As a result of this acquisition, defendant has proposed a change of operations which will be presented to the Change of Operations Committee on October 25, 1978.

12. In June, 1978, defendant began dispatching Region 2 drivers into Region 1, which sometimes resulted in Region 2 drivers remaining away from home one or two extra nights. In addition, defendant dispatched Region 1 drivers into Region 2 and

dispatched common board drivers outside of Region 1 and Region 2 without permitting them to return to their domicile in Milton, Pennsylvania. Defendant's "trip sheets" indicate that for the period beginning June 10 and ending August 26 there were a total of 94 dispatches where either drivers were sent out of their assigned regions or common board drivers were sent from one region to another region without first returning to Milton.

13. Defendant has dispatched drivers outside their assigned regions in order to determine what will be the most efficient allocation of available manpower over defendant's operating area as expanded by its acquisition of the Great Lakes Express Company. Defendant intends to continue dispatching drivers outside their assigned regions until its proposed change of operations is acted upon by the Change of Operations Committee.

14. Plaintiff contends that such dispatches are in violation of the "Maintenance of Standards" provision of the National Master Freight Agreement, Article 6, section 1, which provides, in part, as follows:

> The employer agrees that all conditions of employment in his individual operation relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest standards in effect at the time of the signing of the Agreement
>
> . . .
>
> \* \* \* \* \* \*
>
> Any disagreement between the Local Union and the Employer with respect to this matter shall be subject to the grievance procedure.

15. Plaintiff and defendant agree that the dispute over such dispatches is within the grievance clauses of both the national and local collective bargaining agreements.

16. At the time this suit was filed 20 grievances concerning unauthorized dispatches had been submitted under Article 43 of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement. Three of these grievances were scheduled to be heard at the September meeting of the Joint Area Grievance Committee. Plaintiff, however, postponed the hearing of these grievances until the October meeting of the Joint Area Grievance Committee. Several of the grievants testified at the preliminary injunction hearing that the allegedly unauthorized dispatches required them to spend at least an additional night away from home, thus depriving them of the companionship of wife and family.

17. Should the Joint Area Grievance Committee decide in favor of the grievants, the grievants could receive a monetary award and defendant could be required to cease and desist from dispatching drivers in contravention of the provisions of the July 29, 1974 Change of Operations agreement.

18. On August 18, 1978, plaintiff filed the instant application for a preliminary injunction to restore the status quo ante pending resolution of the dispute through the grievance machinery established under the collective bargaining agreements in effect between plaintiff and defendant. Hearings on the application for a preliminary injunction were held on September 6 and 7, 1978.

19. At the time of these hearings, both parties indicated that they were willing to settle this matter through the grievance procedures.

## DISCUSSION

### I. Jurisdiction

In *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that federal courts may enjoin a union from striking in violation of an agreement not to strike pending resolution of the underlying dispute through the arbitration procedures set up under the terms of the parties' collective bargaining agreement. Such injunctions, the Court declared, are necessary to effectuate the strong national policy favoring the peaceful settlement of labor disputes through arbitration. *Id.* at 243–44, 90 S.Ct. 1583.

This decision represented an accommodation of the anti-injunction strictures of the Norris-LaGuardia Act [5] and the subsequently enacted provisions of the Labor Management Relations Act, which empowers federal courts to entertain suits for the violation of collective bargaining agreements. *See* 29 U.S.C. § 185. This accommodation of the Norris-LaGuardia Act and the Labor Management Relations Act [6] also applies to actions instituted by unions requesting preliminary injunctive relief pending arbitration. *See Hoh v. Pepsico, Inc.,* 491 F.2d 556 (2d Cir. 1974); *Communication Workers v. Western Electric Co.,* 430 F.Supp. 969 (S.D. N.Y.1977); *Pittsburgh Newspaper Printing Pressmen's Union No. 9 v. Pittsburgh Press Co.,* 343 F.Supp. 55 (W.D.Pa.1972), *aff'd,* 479 F.2d 607 (3d Cir. 1973); *United Steelworkers v. Blaw-Knox Foundry & Mill Machinery, Inc.,* 319 F.Supp. 636 (W.D.Pa. 1970).[7] For example, in *Blaw-Knox, supra,* the court observed: "[t]he granting of injunctive relief restraining defendant-company's action pending a determination by the arbitrator of the right of defendant to pursue such action under the terms of the Collective Bargaining Agreement would not contravene the policy of the Norris-LaGuardia Act." *Id.* at 640.

Defendant, however, contends that the power of the federal courts to issue injunctions in favor of labor unions in order to restore and maintain the status quo ante pending arbitration was eviscerated by the Supreme Court's ruling in *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), which holds that federal courts may not enjoin a sympathy strike pending the arbitrator's determination as to whether the strike violates a no-strike clause. The Court in *Buffalo Forge* utilized the "quid pro quo" analysis that had previously been employed in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 921, 1 L.Ed.2d 972 (1957), and in the *Steelworkers Trilogy.*[8] Under this analysis an agreement not to strike over an arbitrable matter is considered the quid pro quo for the employer's agreement to arbitrate. Federal courts may therefore enjoin a strike over an arbitrable issue to ensure that the employer receives the benefit of his bargain. Otherwise, the arbitral process itself may be frustrated.[9]

In the typical *Boys Markets* situation, the issue is whether actions by the employer violate the collective bargaining agreement and a strike over such a dispute directly controverts the pledge to arbitrate. In the sympathy strike situation, however, the issue is whether or not the strike itself violates the no-strike clause, and not whether management action contravenes the collective bargaining agreement. Thus, the employer's agreement to arbitrate cannot be said to have been given in exchange for the union's pledge not to strike when the extent of that pledge is the very matter of contention. The question of the right to engage in the sympathy strike must, of course, be resolved through arbitral processes established by the parties and the employer does not have an enforceable contractual right to enjoin such strike until it is determined that

---

**5.** 29 U.S.C. §§ 101–15.

**6.** 29 U.S.C. §§ 141–187.

**7.** Several lower court decisions antedating *Boys Markets* also held that the federal courts could enjoin employers pending arbitration. *See Local 464, American Bakery and Confectionary Workers Int'l Union v. Hershey Chocolate Corp.,* 245 F.Supp. 748 (M.D.Pa.1965); *Local 1098, Ass'n of St. Coach Employees v. Eastern Greyhound Lines,* 225 F.Supp. 28 (D.D. C.1963).

**8.** *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v.*

*American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). *See generally* Comment, *Injunctions Restraining Employers Pending Arbitration: Equity and Labor Policy,* 82 Dick.L.Rev. 487, 489–91 (1978).

**9.** The Court has also implied a no strike pledge where the collective bargaining agreement contained an arbitration clause but no corresponding no-strike clause in order to protect the arbitral process. *See Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

the strike violates the no-strike clause.[10] *Buffalo Forge, supra,* 428 U.S. at 407–12, 96 S.Ct. 3141.

Defendant argues that this analysis necessarily precludes the issuance of an injunction in favor of the union to restore and maintain the status quo ante pending arbitration. Defendant relies heavily upon *Transit Union Division 1384 v. Greyhound Lines, Inc.,* 550 F.2d 1237 (9th Cir. 1977) (*Greyhound II*) and *Texaco Independent Union v. Texaco, Inc.,* 452 F.Supp. 1097 (W.D.Pa.1978), in which the courts did use the "quid pro quo" analysis and concluded that, in the absence of an express or implied agreement on the part of the employer to maintain the status quo pending arbitration, federal courts may not restrain contested employer actions pending arbitration. *Greyhound II, supra,* at 1238–39; *Texaco Independent Union, supra,* at 1104–05.

Both of these cases, however, also recognize that in proper circumstances an injunction may issue in favor of a union to preserve the status quo pending arbitration in order to protect the arbitral process. *Greyhound II, supra,* at 1238–39; *Texaco Independent Union, supra,* at 1105–06. In *Texaco Independent Union,* the court noted:

'An injunction to preserve the *status quo* pending arbitration may be issued *either against a company or against a union* . . . where it is necessary to prevent conduct by the party enjoined from ren- dering the arbitral process a hollow formality in those instances where . . . *the arbitral award when rendered could not return the parties substantially to the status quo ante.'*

*Id.* at 1106, *quoting Lever Bros. Co. v. International Chemical Workers, Local 217,* 554 F.2d 115, 123 (4th Cir. 1976) (emphasis added.).

■ The common thread running through *Boys Markets, Buffalo Forge, Greyhound II,* and *Texaco Independent Union,* then, is this: Federal courts have the power to restrain both employer and union actions when necessary to protect the arbitral process. The circumstances under which the actions of the party to be enjoined pose a substantial threat to the arbitral process are those which federal courts have historically found to satisfy the irreparable harm prerequisite to the issuance of a preliminary injunction.[11] Rather than consider *Buffalo Forge* as having eliminated jurisdiction to issue injunctions in favor of unions with an exception for those cases in which injunctions have historically issued because irreparable harm was proven,[12] *Buffalo Forge* should be considered as not having affected jurisdiction in the type of case at bar. Thus, I believe it is appropriate to approach such cases as is presented here under the guidelines of *Boys Markets.*

This is the approach that was taken in *Communication Workers v. Western Elec-*

---

10. This result is consistent with the national policy favoring resolution of labor-management disputes through the parties agreed upon grievance mechanisms. Federal judicial interference beyond that which is necessary to compel enforcement of the agreement to arbitrate would intrude on the contractual relationship between the parties and needlessly involve the federal courts in the merits of the dispute.

11. *E. g., United Steelworkers v. Blaw-Knox Foundry & Mill Machinery, Inc.,* 319 F.Supp. 636, 641 (W.D.Pa.1970) (employer actions that endanger the health and safety of its employees threaten imminent irreparable harm sufficient to justify the issuance of a preliminary injunction).

12. This is the manner in which *Texaco Independent Union* addressed the question of the power of federal courts to restrain employer actions pending arbitration. On cross motions

for summary judgment the court ruled that under *Buffalo Forge* the union was not entitled to preserve the status quo pending arbitration unless it could demonstrate that the employers actions would render the arbitration process a "hollow formality." *Id.* at 1106. The court thus denied the cross motions for summary judgment and conducted hearings that were directed at the extent of the harm that the employees would suffer and whether such harm could be remedied through the arbitral process. In concluding that the union had not shown that it would suffer irremediable harm, the court relied explicitly on irreparable harm cases. Thus, the approach in *Texaco Independent Union* is, for all intents and purposes, the same as that which the courts have used in pre-*Buffalo Forge* preliminary injunction proceedings instituted by labor unions.

*tric Co.,* 430 F.Supp. 969 (S.D.N.Y.1977) and *Steelworkers v. Fort Pitt Steel Casting,* 452 F.Supp. 886, 98 L.R.R.M. 3072 (W.D.Pa. 1978). In *Communication Workers, supra,* Judge Haight stated:

> ▮n *Boys Markets* the Court sought to reconcile and' accommodate the anti-injunction strictures of Norris-LaGuardia to the subsequently enacted jurisdictional remedies of the Labor Management Relations Act. In *Boys Markets* that accommodation took the form of sanctioning an employer's injunction against a strike, notwithstanding the strictures of § 4 of Norris-LaGuardia, where the strike arose out of a dispute the union had agreed to arbitrate. But surely the process of accommodation and reconciliation is a two-way street. In the case at bar, the Union seeks an injunction of Company actions arising out of an arbitrable dispute, notwithstanding the strictures of § 7 of Norris-LaGuardia. Such a remedy is consistent with the rationale of *Boys Markets,* and is not foreclosed by *Buffalo Forge,* which *au fond* does no more than decline to apply the *Boys Markets* result to a sympathy strike.[13]

*Id.* at 978.

*Id.* at 977.

▮ This reading of *Buffalo Forge* seems consistent with the interpretation of the Court of Appeals for the Third Circuit,

which has noted: "*Buffalo Forge* states a jurisdictional rule: *In the absence of a dispute over an arbitrable issue,* a district court lacks jurisdiction to give injunctive relief against a purported breach of a no-strike clause." *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336 (3d Cir. 1976) (emphasis added). Thus, *Buffalo Forge* does not affect this Court's jurisdiction to restrain an employer pending arbitration, and an injunction will issue where the *Boys Markets* [14] conditions are satisfied.[15]

## II. Equitable Principles

A party seeking a preliminary injunction must establish that

(1) There is some likelihood of success on the merits of the dispute, *Hoh v. Pepsico, Inc.,* 491 F.2d 556, 561 (2d Cir. 1974);

(2) Irreparable harm will result if injunctive relief is denied, *Fort Pitt Steelcasting, supra,* 452 F.Supp. at 891, 98 L.R.R.M. at 3074;

(3) The balance of hardships weighs in favor or the party seeking the injunctive relief, Division 1098, *Amalgamated Association of Street Employees v. Eastern Greyhound Lines, Inc.,* 225 F.Supp. 28, 30 (D.D.C.1963); and

(4) no adequate remedy at law exists, *International Union of Electrical Workers v. Radio Corp. of America,* 77 L.R.R.M. 2201, 2204 (D.N.J.1971).

---

**13.** Judge Haight then denied the union's request for a preliminary injunction because the union had failed to prove irreparable harm. In Fort Pitt, *supra,* the court also concluded that *Buffalo Forge* did not preclude the issuance of an injunction to maintain the status quo but then granted the preliminary injunction because irreparable harm had been shown. *Id.* at 889–90, 98 L.R.R.M. at 3074–75.

**14.** The *Boys Markets* conditions are as follows:

   (1) the collective bargaining agreement contains a dispute-resolution procedure;

   (2) the dispute between the union and employer is subject to this dispute-resolution procedure;

   (3) the party seeking the injunction is willing to arbitrate; and

   (4) injunctive relief is warranted under traditional equitable principles.

*See Transit Union Division 1384 v. Greyhound Lines, Inc.,* 529 F.2d 1073 (9th Cir.); *vacated*

*and remanded,* 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976).

The parties in the instant case agree that the first three *Boys Markets* conditions are satisfied here and therefore my inquiry is restricted to the equitable criteria for the issuance of an injunction.

**15.** An historical analysis also supports the result reached here. As one commentator has observed, "[t]he issuance of injunctions against employers does not raise the fundamental concerns of Norris-LaGuardia as does the issuance of injunctions against strikes. Therefore, no basis exists in *Buffalo Forge* for abandoning the equity criteria previously adopted for issuing injunctions against employers or for requiring any provisions paralleling a no-strike clause as a prerequisite to such relief." Gould, *On Labor Injunctions Pending Arbitration: Recasting* Buffalo Forge, 30 Stan.L.Rev. 533, 559 (1978).

## A. Likelihood of Success

In order to protect the arbitral process and to prevent the courts from becoming entangled in labor-management contract disputes the requirement that the party seeking the preliminary injunction demonstrate a probability of success on the merits has been somewhat lowered. Thus, it is enough that the "position [plaintiff] will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." *Transit Union Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073 (9th Cir.), *vacated and remanded*, 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976) (*Greyhound I*). In the instant case, defendant agrees that the dispute is subject to the grievance provisions of the collective bargaining agreement and, after a review of the record, I cannot find that grieving the dispute will be a futile endeavor.

## B. Irreparable Injury

Although the likelihood of success requirement should be lowered to prevent courts from performing the function of the arbitrator, the requirement of showing irreparable harm must remain significant.[16] Plaintiff in the case at bar contends that irreparable harm is being suffered in the following respects:

(1) defendant's drivers are forced to spend off-duty hours away from home and are thus suffering the loss of companionship and affection of their families, and their ability to perform the duties of parent and husband;

(2) defendant's drivers are losing confidence in the collective bargaining system and plaintiff's ability to perform its duties as their collective bargaining representative;

(3) defendant's drivers could possibly lose medical insurance coverage if they refuse to make an allegedly unauthorized run and if defendant discharges them for such refusals; and

(4) defendant's stated intention of continuing to dispatch drivers outside their assigned region is tantamount to a threatened plant closure because defendant may discharge all drivers who refuse an assignment.

"Irreparable harm means irremediable injury that is certain and great." *Flood v. Kuhn*, 309 F.Supp. 793, 799 (S.D.N.Y.1970), *aff'd*, 443 F.2d 264 (2d Cir. 1971), *aff'd*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Inconvenience is not sufficient. *See Local 174, Utility Workers Union v. South Pittsburgh Water Co.*, 345 F.Supp. 52 (W.D.Pa.1972); *SIU de Puerto Rico v. Virgin Islands Port Authority*, 334 F.Supp. 510 (D.C.V.I.1971).

Proof that an employer's actions are causing "a tremendous disruption in [its employees'] personal lives and the personal lives of their families" may constitute irreparable harm. *Technical, Office & Professional Workers Union Local 757 v. Budd Co.*, 345 F.Supp. 42 (E.D.Pa.1972). Here, however, plaintiff has not shown that the allegedly unauthorized dispatches seriously disrupted the personal lives of its members. According to the testimony adduced at the hearing, only in some instances did the allegedly unauthorized dispatches result in drivers spending additional nights away from home. Furthermore, the testimony indicates that drivers had spent as many as four nights away from home while remaining wholly within their assigned region and that drivers had been told when hired by defendant that they may on occasion have to spend several consecutive nights away from home. In view of this testimony, the relatively infrequent incidence of allegedly unauthorized dispatches per driver, and the lack of credible testimony that the allegedly unauthorized dispatches had a serious impact on the personal lives of the affected drivers, I must conclude that plaintiff has not shown the type of harm which is "irremediable, certain and great."

---

16. *See generally* Comment, *Injunctions Restraining Employers Pending Arbitration: Equity and Labor Policy*, 82 Dick.L.Rev. 487, 498–501 (1978). Irreparable harm has been described as "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 (1973).

■ In addition, the possible loss of confidence in the collective bargaining system and plaintiff's ability to serve as collective bargaining representative is not the type of harm that can be characterized as irreparable. *Cf., Local 464, American Bakery & Confectionary Workers International Union v. Hershey Chocolate Corp.*, 245 F.Supp. 748, 749 (M.D.Pa.1965) (affront to status of local union is not irreparable harm). But even if such a consequence could be considered irreparable harm, plaintiff has produced no evidence to show that the allegedly unauthorized dispatches have caused the affected drivers to lose confidence in the collective bargaining system or in plaintiff's ability to act as their collective bargaining representative. Thus, plaintiff's assertion of loss of confidence is "far too vague and speculative to form the foundation for equitable relief." *Communication Workers, supra*, 430 F.Supp. at 979.

Likewise, plaintiff's claims that medical insurance coverage *may* be lost *if* drivers are discharged for failing to accept a dispatches outside their assigned regions and that defendant's stated intention to continue to make such dispatches is tantamount to a threatened plant closure are too conjectural to provide the imminent type of harm necessary for the issuance of injunctive relief. Although there was testimony which indicated that a driver would be discharged for refusing an assignment, the circumstances under which such loss of job could not be adequately remedied through a grievance award are far too remote and speculative to afford a basis for a finding of irreparable harm.

■ The claim that defendant's allegedly unauthorized dispatches are tantamount to a threatened plant closure was raised for the first time in plaintiff's post-hearing brief. Plaintiff reasons that if all drivers who received an allegedly improper dispatch refused to accept such dispatch and were consequently fired, "the Milton terminal would lack drivers and virtually would be closed in a few weeks." This "what if" type of extrapolated reasoning cannot substitute for the concrete showing of irreparable harm that is necessary to support the issuance of a preliminary injunction.

### C. Adequate Remedy

Testimony at the hearings on the preliminary injunction indicates that the grievance committees established under the collective bargaining agreements have the power to compensate those drivers who were forced to perform improper assignments for the time spent away from home and to order defendant to cease and desist from assigning runs that violate the collective bargaining agreements. I find this testimony credible and believe that the parties' agreed upon grievance system can adequately remedy any injury suffered as a result thereof.

### D. Balance of Hardships

Dispatches of drivers outside their assigned region were made because of the change in traffic patterns and the increase in freight accompanying the 1977 acquisition of Great Lakes Express Company. Defendant believes such directives are necessary to provide effective and efficient service to its customers. An interference with defendant's ability to provide service to its customers would harm not only defendant but also the public in general as well, and I believe that the balance of hardships therefore tips in favor of defendant. *See Communication Workers v. Western Electric Co.*, 430 F.Supp. 969, 980 (S.D.N.Y.1977).

Under these circumstances, I believe that the issuance of a preliminary injunction would be unwarranted and therefore decline to grant the relief requested by plaintiff.

### CONCLUSIONS OF LAW

(1) This Court has jurisdiction over the plaintiff's cause of action and the relief sought thereunder by virtue of the provisions of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

(2) Plaintiff has demonstrated a likelihood of success on the merits of the dispute.

(3) Plaintiff has failed to prove that irreparable harm will be suffered if defend-

ant is not restrained from dispatching drivers at the Milton terminal outside their assigned region.

(4) If dispatches outside the driver's assigned region are determined to violate the parties' collective bargaining agreement, any injury suffered by the affected drivers can be remedied through the grievance procedure.

(5) The balance of hardships weighs more heavily in favor of defendant.