SIU DE PUERTO RICO, etc., for itself and on behalf of certain of its members, Plaintiff

v.

VIRGIN ISLANDS PORT AUTHORITY, Defendant

Civil No. 515-1971

District Court of the Virgin Islands

Division of St. Croix

December 10, 1971

---

ROBERT H. RUSKIN, Christiansted, St. Croix, V.I., *for the plaintiff*

ATTORNEY GENERAL, Christiansted, St. Croix, V.I., *for the defendant*

YOUNG, *Judge*

## MEMORANDUM OPINION

On November 26, 1971, plaintiff, hereinafter referred to as the "UNION", came before the Court, filing this action for an injunction and money damages against the Virgin Islands Port Authority, hereinafter referred to as the "PORT AUTHORITY". Concurrently with filing this action, the Union appeared ex parte seeking a temporary restraining order which would require the Port Authority to restore the St. Thomas work schedule for seamen, coxswains and signalmen and to restrain the Port Authority from changing such work schedule unilaterally. Jurisdic-

tion is founded under Section 301 of the Labor Management Relations Act. Article 8 of the collective bargaining agreement between the parties hereto states in part as follows:

". . . coxswains, seamen and signalmen shall work one (24) hours watch every fourth day. Maintenance on boat to take place between the hours of 8:00 A.M. to 5:00 P.M., Monday through Friday."

On November 15, 1971, the Port Authority notified the employees through their shop steward that the work schedule would be changed from the hours set forth in Article 8, and that the new hours would henceforth be from 6:00 A.M. to 6:00 P.M. five workdays each week. There would be two shifts during this twelve hour period. In addition, there is a schedule of workers who would be on call between the hours of 6:00 P.M. to 6:00 A.M. to handle and ship movements during such periods. The collective bargaining agreement contained a "no strike" clause as well as an arbitration clause. The agreement also contained an automatic renewal unless either party gave due notice of termination. In this instance, both parties notified each other of its intention to terminate the present agreement by its own terms on December 31, 1971 and also notified each other of their intention to negotiate a new contract.

It was brought out at the ex parte hearing that concurrently with the filing of this action the Union commenced the proceedings to arbitrate the right of the Port Authority to unilaterally change the work hour schedule. Except for the allegations in the complaint, there were no supporting affidavits substantiating the contention that the Union and its affected members would suffer irreparable injury if a temporary restraining order were not granted. For that reason, I denied the temporary restraining order and instead issued an order to show cause, requesting the Port

Authority to appear on December 1, 1971 to show why a temporary injunction, as requested in the complaint, should not be issued by the Court. At that hearing the shop steward gave testimony establishing that the change in the work schedule was made without any prior consultation with the Union, although he admitted being notified of the schedule change prior to the effective date. He forthwith contacted Union officials and sent a letter to the Port Authority requesting that the schedule be not changed until after the Union had an opportunity to voice its objections as a grievance. He also testified generally that the change in the working hours would have a serious effect upon the coxswains, seamen and signalmen, not only depriving them of a certain amount of overtime compensation which they had been regularly receiving, but that it affected their daily lives with their families and other work pursuits.

The Port Authority presented testimony that the work schedule was changed after a study of the ship movements disclosed the excessive costs of maintaining boat crews on 24 hour, around the clock duty when almost all of the ship movements were during daylight hours. The change in the work schedule would save the Port Authority approximately $100 per day, totalling approximately $4,000 for the balance of the current collective bargaining agreement. The Port Authority was not unwilling to arbitrate. It would, in fact, arbitrate the dispute, even though the arbitration may extend beyond the life of the current contract. The Port Authority contends that it has the right, pursuant to management powers and rights under Article 12 of the contract, to revise and change from time to time the work schedule of the employees.

The Port Authority was operating with total annual revenues of about $2,500,000 and a net loss of $1,500,000. Its wages and salaries alone amounted to $2,368,309 for 1970. Efforts were being made by management to effect

certain economies, one of which was to revise the work schedule to suit the bulk of the ship movements and to cut down on overtime payments.

The Union argues that the Port Authority should not have unilaterally changed the work schedule without having first arbitrated its right to do so. However, now, since there is only a month and a half left of the current contract, the Union urges that it would be useless for the dispute to be resolved by arbitration. The arbitration process would extend beyond the remaining life of the contract. Hence the Union is not asking this Court to enforce the arbitration clause. To the contrary, it is seeking to substitute this Court for the arbitrators for the very refreshing reason that the District Court is able to act more expeditiously than can the arbitrators. By the same token, the Port Authority argues that, had it resorted to arbitration first, the contract would have ended before any possible resolution by arbitration. This would have made the entire issue moot and would not have accomplished the savings that the Port Authority is now effecting by the work schedule change.

The hearing was continued to December 6, 1971 for further testimony or affidavits of the workers describing their claims of substantial and irreparable injury. At this final hearing, both parties furnished the Court with additional evidence pertinent to the change of the work schedule. I find these statistics to be the facts. Each of the four seamen who filed affidavits received a base wage for 1970 of $5,910. The average overtime for the year was $1,800. However, in addition to this total Port Authority earnings of $7,710, the average "side income" from taxi operations (each of them drives taxicabs during the three free days between each fourth day of 24 hour duty) was about $4,000. The hardship, as described in the affidavits, arises from the deletion of the three free days, which, in turn, dis-

rupts the taxicab activities. The irreparable injury, as further described in the affidavits, comes from the fact that the affiants borrowed money, and the repayment schedules of these loans were geared to the total earnings of base pay, overtime and side time. The new work schedule has cut down the earnings from overtime and side time.

The affidavits of the signalman and the three coxswains present the same problems. They, too, are engaged in taxi operations "on the side". The only notable difference is that the chief coxswain, who is the shop steward, earned overtime pay of $7,129 for 1970, in addition to his base pay of $8,752 and his side income from taxi operations of presumably about $4,000.

There is the nub of this action. The new work schedule, in doing away with the "1 in 4" and spreading the work over five consecutive days, has about eliminated overtime and has seriously interfered with the side time occupations of the coxswains, seamen and signalmen. It also calls for extra duty for those crews "on call" to handle the few ship movements occurring at night between 6:00 P.M. and 6:00 A.M.; and this, the affiants say, interferes with their home lives.

From these facts, I do not find that there will be irreparable and substantial injury done to the workers by denial of their petition for an injunction. In balancing the equities, I do not equate their loss of overtime and taxicab income with the "drop in the bucket" savings of $4,000 from a $1,500,000 deficit. The Port Authority will have to find other and more effective means and ways to recover from its inefficient, deficit operations. However, this is a step in the right direction. Yet, I do not decide whether it had the right to take this step before the end of the current contract. The arbitrators might very well decide that the Port Authority was bound to adhere to the work schedule set forth in the contract and that it had no inherent man-

agerial right to change the schedule during the term of the contract. As I view the situation in this last month of the current contract, whether the former work schedule will be restored or not will be decided at the negotiation table for a new contract commencing January 1, 1972. The arbitrators will only decide whether the Port Authority was right or wrong, and, if wrong, how much it should pay to the workers for the loss of overtime which they were accustomed to receive. On authority of Boys' Market v. Retail Clerks Union Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), I do not consider that the issuance of an injunction, which in this case is not to enforce arbitration but to by-pass it, is warranted under ordinary principles of equity.