GENERAL DRIVERS AND DAIRY EM-
PLOYEES, LOCAL NO. 563; General
Drivers and Helpers, Local No. 354;
General Teamsters, Local No. 662; and
Drivers, Salesmen, Warehousemen,
Milk Processors, Cannery, Dairy Em-
ployees and Helpers, Local No. 695,
Plaintiffs,

v.

BAKE RITE BAKING COMPANY,
Defendant.

Civ. A. No. 84-C-0138.

United States District Court,
E.D. Wisconsin.

Feb. 3, 1984.

Marianne Goldstein Robbins and Timothy
G. Costello, Goldberg, Previant, Uelmen,
Gratz, Miller & Brueggeman, S.C., Milwau-
kee, Wis., for plaintiffs.

Michael E. Perino and Ronald J. Rutlin,
Mulcahy & Wherry, S.C., Milwaukee, Wis.,
for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is a reverse *Boys Markets* action in which the plaintiff unions seek an injunction against the defendant employer pending arbitration of a labor dispute. The court's jurisdiction over the subject matter derives from § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and 28 U.S.C. § 1337. Presently before the Court are the plaintiffs' motions for a preliminary injunction and the defendant's motion for a stay of proceedings. Arguments in support of and in opposition to the motions were entertained in a hearing on February 1, 1984. Based upon the arguments and submissions of counsel, the Court arrives at the following findings of fact and conclusions of law.

## A. FINDINGS OF FACT

1. Defendant Bake Rite Baking Company ("Bake Rite") is a Wisconsin corporation with its principal place of business in Plover, which is near Stevens Point, Wisconsin. It also operated distribution facilities in Portage, West Allis, Appleton, Green Bay, Tomahawk, and Eau Claire, Wisconsin. Until January 28, 1984, Bake Rite was engaged in the wholesale production and distribution of bread. It employed approximately two hundred workers.

2. Bake Rite, like other members of the wholesale bread baking industry, produced both "advertised label" and "private label" bread products. Advertised label bread is bread that carries the brand name of the baking company. In the present case, Bake Rite's advertised label bread was marketed under the name "Mrs. Carter's." By contrast, private label bread carries the name of a warehouse distributor or a supermarket with whom the wholesale bakery has a sales account. Approximately sixty percent of Bake Rite's production and distribution consisted of private label bread products.

3. The plaintiffs General Drivers and Dairy Employees Local No. 563; General Drivers and Helpers, Local No. 354; General Teamsters, Local No. 662; and Drivers, Salesmen, Milk Processors, Cannery, Dairy Employees and Helpers, Local No. 695 ("the unions") comprise a single bargaining unit of Bake Rite employees.

4. The unions and Bake Rite negotiated a collective bargaining agreement covering wages and working conditions of Bake Rite. The collective bargaining agreement went into effect on May 1, 1982, and was set to expire May 1, 1984.

5. Article 4 of the collective bargaining agreement governs transfers of Bake Rite's "operations." It provides:

"This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event an entire operation or any part thereof is sold, leased, transferred or taken over by sale; transfer, lease, assignment, receivership of bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof. It is understood by this section that the parties hereto shall not use any leasing device or subcontract to a third party to evade this contract. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, leasee, assignee, etc., of the operation covered by the Agreement or any part thereof. Such notice shall be in writing, with a copy to the Union no later than the effective date of sale. In the event the Employer fails to give the notice herein required and/or fails to require the purchaser, transferee or leasee to assume the obligation of this contract, the Employer shall be liable to the Union and the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this contract."

6. Article 7 of the collective bargaining agreement governs subcontracting of work or service. It provides:

"The Employer agrees that no work or service presently performed or hereafter assigned to the collective bargaining unit shall be subcontracted, transferred,

leased, assigned, or conveyed in whole or in part to any other plant, person or non-unit employees, except as being provided for in this Agreement or upon consent of the Union."

7. Article 14 of the collective bargaining agreement governs arbitration of disputes. It provides:

"In case any dispute or misunderstanding arises relative to Articles of this Agreement which cannot be settled between the parties to this Agreement, then, the same may be referred by either party to the Wisconsin Employment Relations Commission for the appointment of an arbitrator from its staff. The arbitrator shall conduct a hearing and receive testimony regarding the misunderstanding. The arbitrator shall, within five (5) days after completion of the hearing, exclusive of Sundays and holidays render his decision. The findings and decision of the arbitrator shall be binding on all parties to this Agreement.

8. The wholesale bread market is characterized by intense competition. The average wholesale price per unit in the relevant market has declined from approximately 44 to 48 cents in 1980 to 32 to 38 cents in 1983. However, costs of production also increased from approximately 4 cents per unit in 1980 to approximately 10 cents per unit in 1983.

9. After 1972, Bake Rite began to suffer financial difficulties and, in 1979, petitioned for relief under Chapter 11 of the Bankruptcy Code.

10. Under the plan negotiated during the bankruptcy proceedings, Mor America Financial Corporation ("Mor America") became Bake Rite's sole secured creditor and the owner of 100 percent of Bake Rite's preferred stock. The pre-existing secured creditors agreed to an arrangement whereby Bake Rite's total liabilities were reduced from approximately nine million dollars to approximately four million dollars. The unsecured creditors took approximately 10 cents per dollar of debt.

11. Bake Rite continued to lose money in its operations after the bankruptcy proceedings concluded. In 1980 and 1981, Bake Rite suffered operating losses of $99,000 and $234,000, respectively, exclusive of debt service.

12. In 1981, Mor America filed a foreclosure action against Bake Rite as a consequence of the latter's inability to make payments on principal and interest owing to the former. The foreclosure action was dismissed in 1982 when the parties agreed that Mor America would become the sole owner of all Bake Rite's common stock.

13. Bake Rite continued to sustain operating losses through 1983, losing $67,000 in 1982 and $700,395 in 1983. Much of the losses in 1983 were caused by Bake Rite's loss of a major private label sales account. The losses were sustained notwithstanding the fact that Mor America did not require Bake Rite to make any payments on principal or interest on outstanding debts after dismissal of the foreclosure action.

14. Throughout 1983, Bake Rite sought unsuccessfully for a purchaser who would take over its capital assets as an ongoing concern.

15. In January 1984, it was decided that Bake Rite should cease operations entirely and liquidate its assets in order to minimize its losses to the fullest extent possible.

16. On January 23, 1984, Bake Rite entered into an asset purchase agreement with Gardner Baking Company ("Gardner") whereby Gardner would purchase all equipment, vehicles, office equipment and supplies, trademarks, tradenames, brand names, customer lists, certain purchase orders, and certain inventory.

17. On the same date, Bake Rite informed its employees who are members of the unions that it would cease all operations on January 28, 1984, and that they would be permanently laid off as of that date. The employees were also told that they would be paid as if they worked their last shift up to and including January 31, 1984. This was the first formal notice to the employees of the impending cessation of operations.

18. By letter dated January 24, 1984, Bake Rite advised Gardner that Bake Rite was a party to a collective bargaining agreement with the unions, and expressed the opinion that the asset purchase agreement would not violate the collective bargaining agreement. A copy of the collective bargaining agreement was attached to the letter. No copies of the letter were forwarded to the unions.

19. The transfer of assets was completed on January 24, 1984, and Bake Rite ceased all operations on that date.

20. At the time Bake Rite ceased operations, it owed members of the unions substantial sums for accrued vacation, outstanding grievances, and outstanding grievance settlements. As of February 1, 1984, these obligations have not been satisfied.

21. Gardner has hired several former Bake Rite employees, and has expressed an interest in hiring others. However, other former Bake Rite employees have applied for work with Gardner and have been rejected.

22. Bake Rite still owns its plant facilities and approximately twenty-seven acres of property on which the plant is situated near Plover, Wisconsin. The fair market value of this property is approximately 1.5 million dollars. Bake Rite has announced an intention to sell this property, yet no purchaser had been sought or obtained as of February 1, 1984. Proceeds of the sale will be used to satisfy obligations to Mor America and other secured creditors. In addition to the plant and premises, Bake Rite has an undisclosed amount in accounts receivable.

23. As of January 27, 1984, Bake Rite had not filed a written notice of sale with the Wisconsin Department of Industry, Labor and Human Relations ("DILHR").

24. On January 27, 1984, the unions filed a grievance protesting the cessation of operations and the sale of assets.

## B. POSITIONS OF THE PARTIES

On their motion for injunctive relief pending arbitration, the unions present three principal contentions. First, they argue that there has been no indication that Gardner is going to assume Bake Rite's obligations under the collective bargaining agreement, and that there has been no notice to Gardner that it will be required to assume Bake Rite's obligations. The unions contend that if the sale of the above-enumerated assets to Gardner is completed without the latter's assumption of the collective bargaining agreement, the unions will not be able to enforce the requirement that Article 4 be binding on all successors.

Second, the unions argue that the purchase of assets agreement with Gardner and the proposed sale of real property violate Articles 4 and 7 of the collective bargaining agreement. The unions have never given their consent to these transfers, and they would not consent because the proceeds of the sales would be used to satisfy principal and interest obligations to secured creditors rather than to settle grievances with and discharge obligations to the union members.

Third, the unions argue that by failing to notify the DILHR of the sale, Bake Rite has violated Wis.Stat. § 109.07. That statute provides:

**Mergers, liquidations, dispositions, relocations or cessation of operations affecting employes; advance notice required.**

(1) Every employer employing 100 or more persons in this state who has decided upon a merger, liquidation, disposition or relocation within or without the state, resulting in a cessation of business operations affecting employes shall promptly notify the department in writing of such action no later than 60 days prior to the date that such merger, liquidation, disposition, relocation or cessation takes place. The employer shall provide in writing all information concerning its payroll, affected employes and the wages and other remuneration owed to such employes as the department may require. The department may in addition require the employer to submit a plan setting forth the

manner in which final payment in full shall be made to affected employes.

(2) Any employer who violates sub. (1), or who fails or refuses to provide all information or a plan for final payment as the department requires is guilty of a misdemeanor and may be fined not more than $50 for each employe whose employment has been terminated as a result of such merger, liquidation, disposition, relocation or cessation of business operations.

The unions argue that there is a private right of action under this statute, and Bake Rite's violation of the statute entitles them to equitable relief.

In response, Bake Rite contends that Articles 4 and 7 of the collective bargaining agreement contemplate transfers of capital assets in the context of an ongoing operation. Yet there is no ongoing operation in the present case. Bake Rite has ceased operations, shut its doors, and completed the transfer of its equipment, trade names, customer lists, and inventory. All that remains is a plot of land, an empty building, and several accounts receivable. Bake Rite contends that Articles 4 and 7 could not conceivably apply to this situation. Alternatively, Bake Rite argues that even if Articles 4 and 7 were applicable, no injunction should issue because (1) the remaining property is sufficiently valuable to satisfy an arbitration award in the unions' favor, and (2) the balance of hardships lies with Bake Rite which will be unable to discharge its obligations to its secured creditors. Finally, Bake Rite argues that the unions lack standing to assert a violation of Wis.Stat. § 109.07.

## C. DISCUSSION

■ The Court assesses the parties' respective contentions in light of several fundamental policies of labor law. These policies are: (1) the policy against judicial interference in labor disputes, 29 U.S.C. §§ 101–115; *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); (2) the promotion of peaceful resolutions of labor disputes

through voluntary arbitration, *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); and (3) deference to managerial prerogative, *Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

■ With respect to the first policy consideration, the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, broadly prohibits federal courts from issuing injunctions in labor disputes. However, in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court recognized a narrow exception to the prohibition and permitted an employer to seek injunctive relief against a threatened union strike where the collective bargaining agreement contained a no-strike clause and the strike involved a grievance that the parties had agreed to submit to arbitration. The Court subsequently emphasized the requirement that the dispute underlying the strike be arbitrable. Where the dispute is not arbitrable, a strike arising out of the dispute cannot constitute an evasion of the duty to arbitrate, and injunctive relief is clearly improper. *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

The present case presents a situation converse to the facts of *Boys Markets* and *Buffalo Forge*, because it is the unions that seek injunctive relief against allegedly adverse managerial action. However, the same policy considerations came into play and the same questions of law arise in this context. *Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981); *Lever Bros. Co. v. Int'l Chemical Workers Union, Local 217*, 554 F.2d 115 (4th Cir.1976); *Teamsters, etc., Local Union No. 764 v. Branch Motor Express Co.*, 463 F.Supp. 282 (M.D.Pa. 1978).

■ The established rule in this circuit is that in order for a *Boys Market* injunction to issue against an employer,

"... the court must be satisfied that traditional requirements of equity—irreparable injury, a balance of hardships, and, *to an appropriate degree*, probability of success on the merits—support the award of injunctive relief. When these preconditions have been satisfied, we believe that a status quo injunction serves the salutary purpose of enforcing the parties' agreement to arbitrate by preserving an effective arbitral remedy for bargaining agreement breaches."

*Panoramic Corp.*, 668 F.2d at 283. Specifically, the union must show (1) that the underlying dispute is arbitrable; (2) that the position of the union in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor; (3) that there is actual or threatened irreparable injury to the union in that the decision of the arbitrator in the union's favor would be but an empty victory; and (4) that the union will suffer more from the denial of injunctive relief than the employer would suffer from its issuance. 668 F.2d at 283–288.

Of particular significance is the second element set forth above, that is, that the union's position in arbitration be sufficiently sound. In this respect, the showing for a reverse *Boys Market* injunction differs from the showing for a traditional preliminary injunction: the corresponding element in the latter context, that the plaintiff must have a reasonable likelihood of success on the merits, *see Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir.1976), is significantly more stringent. In the context of a reverse *Boys Market* injunction, the union need only show that there is a genuine dispute to be arbitrated that is sufficiently sound. To delve further and prognosticate the likely result of the arbitral process would be to intrude significantly on the arbitrator's function.

■ Turning now to the merits of the unions' contentions, I find that they have failed to establish that their position in the prospective arbitration is sufficiently sound that an injunction should issue. In reaching this conclusion, I refer to the language of Articles 4 and 7 of the collective bargaining agreement. Both provisions speak to those situations where the operation, or a part thereof, is transferred and continues to operate under the control of a new entity. There is no express reference to liquidation, and the contractual language does not suggest that the parties intended that Bake Rite's obligations under Articles 4 and 7 would become operative in the event of liquidation. Therefore, if this matter were to proceed to arbitration, any argument that Bake Rite had failed to abide by Articles 4 and 7 would be groundless. Those articles simply do not reach situations such as the one at bar.

■ The remaining argument is whether Bake Rite's purported violation of Wis.Stat. § 109.07 provides grounds for relief in this action. I conclude that it does not. The statute's purpose is to provide an administrative mechanism whereby the state can monitor corporate shutdowns, and, clearly enough, a primary basis for this form of regulation is to insure that all affected employees are paid the remuneration owed them. Yet I do not think Bake Rite's failure to provide notice to DILHR injured the unions' members. First, Bake Rite indicated to its employees that they would be paid through January 31, 1984. Second, there is no assurance that notice to DILHR would have enabled the unions to seek relief under the collective bargaining agreement given the absence of any provisions therein setting forth managerial obligations to the unions in the event of liquidation. Wis.Stat. § 109.07 does not provide relief for the plaintiffs here.

Bake Rite has requested that the Court stay any further proceedings pending arbitration. In view of the foregoing discussion, I find it appropriate to dismiss the case within thirty days of this order unless the unions express a desire to engage in further proceedings here. The motion will be granted.

Based on the foregoing, the Court arrives at the following conclusions of law.

## D. CONCLUSIONS OF LAW

1. Bake Rite's sales of its assets to Gardner, and its proposed sale of other assets to parties as yet unknown, constitute an effort to liquidate and not a transfer of an ongoing operation.

2. The duties imposed on Bake Rite by Articles 4 and 7 of the collective bargaining agreement do not reach liquidation sales.

3. The unions have failed to satisfy an essential element of a prima facie case for injunctive relief pending arbitration.

4. Wis.Stat. § 109.07 does not provide a right to equitable relief for the unions in this case.

### ORDER

IT IS THEREFORE ORDERED that plaintiffs' motion for a preliminary injunction is denied.

IT IS FURTHER ORDERED that defendant's motion for a stay of the proceedings is granted.

IT IS FURTHER ORDERED that this case is dismissed unless the plaintiffs move for a trial on the issue of a permanent injunction within thirty days of the filing date of this order.